PINNACLE PORT COMMUNITY
ASSOCIATION, INC.,
Plaintiff–Appellant,

v.

Charles ORENSTEIN, et al.,
Defendants–Appellees.

No. 88–3018.

United States Court of Appeals,
Eleventh Circuit.

May 23, 1989.

Robert Marshall, Jennifer Fletcher, Ben H. Ervin, and Harry L. Griffin, Jr., Atlanta, Ga., for plaintiff-appellant.

Edmund Quintana, Lew W. Burke, Panama City, Fla., and Donald H. Partington, Pensacola, Fla., for defendants-appellees.

Before ANDERSON and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.

ANDERSON, Circuit Judge:

The Pinnacle Port Community Association, Inc. ("Pinnacle Port") brought suit against Charles Orenstein, North American Mortgage Investors ("NAMI"), and Southmark Corporation ("Southmark"), on claims arising from the construction of a condominium project. The district court granted summary judgment in favor of NAMI and Southmark, and Pinnacle Port appeals. We reverse as to the oral contract, contract adoption and negligence issues, and affirm as to the remaining claims.

## I. BACKGROUND

The plaintiff, Pinnacle Port, is an association of owners of units of the Pinnacle Port condominium complex, located in Bay County, Florida. The defendants are Charles Orenstein, the owner of the project during the relevant period; NAMI, the lender to the project; and Southmark Corporation, a successor of NAMI.

In 1974, Orenstein took over the second mortgage of the condominium project from the original developers in lieu of foreclosure of the project. Undertaking to complete the project, he negotiated with NAMI, the first mortgagee, to provide funds under the same terms as provided to the original developer, and NAMI agreed. As the units were sold, the resulting revenues were to be applied to repay the principal and interest on NAMI's loan, with any additional revenue paid to Orenstein.[1]

---

1. The deposition of Robert Sant'Angelo, NAMI's in-house counsel from 1976–1981, indicates that under the agreement mentioned above NAMI would receive 94% of the return and Orenstein the remainder. It is not clear whether this refers to a different system for dividing the revenue, to an arrangement for splitting profits after both had recovered costs, or is simply a

All was not smooth sailing for the Pinnacle Port project. In 1979, when construction was complete and most of the units had been sold, various deficiencies in the construction became apparent. In addition to assorted finishing touches that remained to be completed, the most serious structural difficulty was that the exterior stucco walls of several units were not watertight. After NAMI took steps to rectify the problems, Pinnacle Port, unsatisfied, sued Orenstein and NAMI in Florida state court. The suit was settled pursuant to a stipulation dated October 4, 1979. The named parties to the stipulation were Charles Orenstein, "d/b/a Pinnacle Port Developers," and Pinnacle Port Community Association, Inc. The stipulation released both Orenstein and NAMI from all claims which had been or could have been made against them based on any aspect of the development, in exchange for promises by Orenstein to perform under the stipulation.[2] The stipulation required Orenstein to make several enumerated repairs, replacements, and other corrections within 180 days. The stipulation also included a merger clause, specifying that "the Association and the Developer agree that there are no oral agreements between them and that all negotiations, discussions, and agreements have been merged herein," as well as a separate integration clause.

Work proceeded under the stipulation. Although there is conflicting testimony as to the division of responsibilities for the repair work, NAMI seems to have taken an increased role. It indicated, at least until August 26, 1982, its intention to complete the work required by the stipulation and it paid for the work actually done. It actively supervised repairs, while Orenstein played at best a small role. The 180-day time limit for completion of the repairs was reached, but Pinnacle Port extended the time. Repairs continued, until in November, 1982, NAMI's attorney presented Pinnacle Port with a report proclaiming the work completed.

Disputing this assertion, on September 24, 1984, Pinnacle Port filed suit against Charles Orenstein and Southmark in district court, seeking to enforce the terms of the stipulation. NAMI was joined as a party on December 4, 1985, and all defendants moved for summary judgment on October 27, 1986. The district court granted summary judgment for NAMI and Southmark, and, after certification pursuant to Fed.R.Civ.P. 54(b), Pinnacle Port appealed the judgment in favor of those defendants to this court.

On appeal, Pinnacle Port raises a number of issues. First, it contends that NAMI and Orenstein were joint venturers. Second, Pinnacle Port argues that the defendants were partners by estoppel. Third, Pinnacle Port claims that NAMI is estopped from denying that it is bound under the stipulation, regardless of whether it is a joint venturer. Fourth, appellant claims that NAMI is obligated due to promissory estoppel. Fifth, Pinnacle Port next contends, NAMI is bound by an independent obligation arising out of an oral contract. Sixth, Pinnacle Port argues that NAMI adopted the stipulation. Finally, Pinnacle Port claims that NAMI is liable for negligently performing the repairs it did undertake.

The scope of this court's inquiry is determined by the summary judgment posture of this case. Summary judgment is inappropriate where, viewing the evidence in the light most favorable to the nonmoving party, there is any genuine issue of material fact. *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir.1983). However, summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of

prediction of the relative return to the two under the arrangement described above.

**2.** The release provision of the stipulation reads, in relevant part, as follows:

16. ... In consideration of the Developer's promises as set forth above, the Association hereby gives the Developer, North American Mortgage Investors and their agents and employees a full and final release of all claims which have been made or could have been made against the Developer, North American Mortgage Investors or their agents and employees for any and all causes of action, claims, warranties, demands or other obligations which ... arose out of ... the development of Pinnacle Port.

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). With these considerations to chart our course, we proceed to the analysis of the claims.

## II. JOINT VENTURE

Pinnacle Port argues that NAMI is a joint venturer of Orenstein. If Pinnacle Port were to create a genuine issue in this regard and, on remand, were to prevail in showing the existence of a joint venture (or, as discussed in section III, partnership by estoppel), NAMI would be bound under the undisputed terms of the stipulation through its partnership with Orenstein. While the release in the stipulation would bar any claims against NAMI arising before the stipulation was signed, claims arising out of the stipulation—i.e., claims derivative of Orenstein's obligations—would not be barred.

■■■ In a joint venture, a form of partnership, one joint venturer can bind the others in matters within the scope of the joint enterprise. *See* Fla.Stat.Ann. § 620.60 (West 1977).[3] A joint venture is established contractually. The contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses; and (4) the right of joint

control. *Kislak v. Kreedian,* 95 So.2d 510, 515 (Fla.1957).[4]

■■■ That the relationship between NAMI and Orenstein satisfies the first and second elements is not in dispute. It is evident that NAMI and Orenstein had a common purpose and a joint proprietary interest: they wished to complete and sell at a profit the Pinnacle Port condominiums, of which Orenstein was the owner and NAMI the mortgagee. With respect to the third element, i.e., the right to share profits and duty to share losses, the financial arrangement between the two is less clear. Some testimony established that, as the condominium units were sold, the revenues would be applied to pay off the principal and interest of NAMI's loan, with any remainder going to Orenstein. However, one of NAMI's attorneys testified that under the agreement NAMI was to receive 94% of the return on the project and Orenstein the rest. While the former version of the facts suggests a lender-developer relationship,[5] the latter version might be consistent with sharing profits.[6] We need not decide whether there is a genuine issue of fact as to sharing profits, however, because the fourth element is lacking: there is no genuine issue of material fact with respect to joint control.

The district court found the following with respect to the agreement between NAMI and Orenstein. NAMI, as lender to the project, would fund it on an "as needed"

---

3. While § 620.60 is written in terms of partnerships, in general, the law governing partnerships is applicable to joint ventures. *Kislak v. Kreedian,* 95 So.2d 510, 514 (Fla.1957).

4. Although the record indicates that NAMI and Orenstein signed a contract defining their relationship with respect to the Pinnacle Port project, the contract itself has not been made a part of the record. However, the contract to engage in a joint venture can be implied or inferred from the parties' conduct. *Navarro v. Espino,* 316 So.2d 646, 648 (Fla.Dist.Ct.App. 1975); *see also Granik v. Perry,* 418 F.2d 832, 836 (5th Cir.1969). The latter case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

5. "Receipt by a person of a share of profits of a business is prima facie evidence that he is a partner [*unless*] ... profits were received in

payment ... as interest on a loan, though the amount of payment varies with the profits of the business." Fla.Stat.Ann. § 620.59(4)(d) (1977) (emphasis added).

6. The testimony, by Robert Sant'Angelo, is itself not clear: "Mr. Orenstein then made an agreement with NAMI whereby NAMI would fund the completion of the project and then there was a—then they would share in the profits on the project. Based on the ratio of Mr. Orenstein's development in the project and NAMI's investment in the project ... it ran something like 94% for NAMI and 6% for Mr. Orenstein." R.6:21–22. This statement might possibly give rise to an inference of joint investment, or it could merely describe the parties' expected relative shares of the revenue, based on the anticipated profit of the project. *See* n. 1, *supra.*

basis until completion. Each month, NAMI representatives would inspect the work, and, if approved, Orenstein would pay for the work out of a designated bank account. NAMI would then make a deposit to the account sufficient to cover the payment. As condominiums were sold, the revenue would be applied to the NAMI loan, with any excess after repayment going to Orenstein.

The district court's finding with respect to the agreement is in fact how the arrangement operated in practice. NAMI and Orenstein each had agents on site who had independent areas of control; the actions of one did not bind the other. *Cf. Kislak v. Kreedian,* 95 So.2d 510, 516 (Fla. 1957) ("inherent in contracts of this nature is the right and the authority of any one of the [joint venturers] to bind the others with reference to the subject matter of the [joint venture]"). Orenstein's authority included preliminarily approving the payment of invoices, employing the foreman and several workers, and hiring and paying for an expert to examine the leaking problem. Thus, Orenstein had the responsibilities associated with being a general contractor and had some areas of independent control. As described by the district court, NAMI's on-site representatives would then review the work; if they approved, sufficient money would be deposited in the project's checking account to cover Orenstein's outlays. NAMI also had representatives at the project to market the condominiums, and a financial officer to approve the terms of each sale; however, there is no evidence that these actions bound Orenstein, the title holder to the property. In sum, Orenstein and NAMI had independent interests and responsibilities with regard to the project; there is no genuine issue of material fact that either acted on the other's behalf in a legally binding fashion.

The control exercised by NAMI as a lender is not contradictory with our holding that Pinnacle Port has not met its burden with respect to this issue. NAMI's actions are consistent with the role of a lender that became increasingly involved with the project to protect its collateral.[7] *See Greiner v. General Electric Credit Corp.,* 215 So.2d 61 (Fla.Dist.Ct.App.1968) (declining to find joint venture element where arrangement arguably indicative of the element is a well accepted business method not restricted to joint ventures). Pinnacle Port has not adduced sufficient evidence as to any right to or actual joint control. Therefore, the district court properly concluded that there was no genuine issue of fact with respect to the joint venture claim.

### III. PARTNERSHIP BY ESTOPPEL

Pinnacle Port next argues that even if NAMI and Orenstein were not joint venturers, NAMI represented itself to be such, and is now estopped from denying the partnership relation. Again, if Pinnacle Port were to prevail on this issue, NAMI would be bound under the stipulation as Orenstein's partner. Because Pinnacle Port's argument is that Orenstein's signature on the stipulation bound its partner (by estoppel) NAMI, only evidence prior to the stipulation is relevant.

Under Florida law, a person who holds himself out as a partner is liable to any person who has given credit on the strength of the representation. Fla.Stat. Ann. § 620.635 (1977);[8] *F.J. Dubos & Co. v. Jones,* 34 Fla. 539, 16 So. 392 (1894) (quoted in *Country Clubs of Sarasota, Ltd. v. Zaun Equipment, Inc.,* 350 So.2d 539, 543 (Fla.Dist.Ct.App.1977) (Smith, J., concurring and dissenting)). While the relevant statute is limited on its face to situations involving the extension of credit, courts interpreting the statute or applying its common-law analog have not adhered to

---

7. Although evidence that NAMI actually performed the obligations of the stipulation is some evidence that it intended at the time of the stipulation to be bound, this evidence is not sufficient to create a genuine issue of joint venture or joint control.

8. The statute reads as follows: "When a person represents himself, or consents to another representing him, to anyone as a partner in an existing partnership or with one or more persons not actual partners by words spoken or written or by contract, he is liable to any person to whom the representation has been made who has given credit on the faith of the representation to the actual or apparent partnership...."

this restriction. *See, e.g., Greenfield v. Cohen,* 432 So.2d 574 (Fla.Dist.Ct.App. 1983) (landlord required only one signature on lease on faith of representation that the three tenants were partners); *Country Clubs of Sarasota, Ltd. v. Zaun Equipment, Inc.,* 350 So.2d 539 (Fla.Dist.Ct.App. 1977) (writ of garnishment served on general partner as shown in certificate of limited partnership sufficient as service on limited partnership, despite previous assignment of general partnership rights).

The Florida statute, a codification of the earlier common-law rule, incorporates the common-law requirement of detrimental reliance. *See, e.g., Greenfield,* 432 So. 2d at 575. The party advancing the estoppel must have taken an action on the faith of the representation, which action would be to his detriment if the representing party can deny the partnership relation. Therefore, Pinnacle Port must show first that NAMI held itself out as a partner or joint venturer and second that Pinnacle Port relied upon that representation to its detriment. For the reasons described above, the only representations relevant to our inquiry are those that occurred before the signing of the stipulation.

NAMI and Orenstein's [9] representatives made statements prior to the signing of the stipulation that could have led Pinnacle Port reasonably to believe that NAMI was a partner in the development. Robert Sant'Angelo, in-house attorney for NAMI, told John Hunter, a member of the Pinnacle Port Board of Directors, that he should "just consider me as a developer." [10] Les Burke, an outside counsel for NAMI and Orenstein in the Pinnacle Port litigation, stated that NAMI and Orenstein were one in the same for the purposes of the settlement negotiations, and that he was signing

on behalf of both parties. Also, Bill Tobin, an on-site representative of Orenstein, said, "You just don't worry about Charles Orenstein. You talk to Bob Sant'Angelo. He writes the checks, he dispenses the funds, and he is the one that you need to discuss any matters that pertain to Pinnacle Port." [11] While—consistent with its contention that the condominium project was not in fact a joint venture—NAMI never used the terms partner or joint venture, its self-description as the developer and as legally one in the same as Orenstein is the type of representation anticipated by § 620.635. *See Greenfield v. Cohen,* 432 So.2d 574, 575 (Fla.Dist.Ct.App.1983) (one partner informed landlord that he had authority to sign the lease for the other partners).

These representations may be sufficient evidence to create a genuine issue of fact with respect to Pinnacle Port's belief that NAMI was a partner. We assume, therefore, that Pinnacle Port believed NAMI was a partner; however, Pinnacle Port's argument nonetheless fails, as there is insufficient evidence of reliance.

Pinnacle Port argues that it relied on NAMI's being bound by the stipulation when it released NAMI from past claims in the settlement of the state court litigation. To the extent that Pinnacle Port can show it took this action in reliance on NAMI's representations, this would be a sufficient detriment. *See Greenfield,* 432 So.2d at 575 (finding partnership by estoppel where asserted detriment was landlord's loss of ability to sue non-signing lessee).

We do not believe that the appellant has met its burden in this regard. The appellant does not offer, and the record does not reveal, any evidence of reliance apart from the stipulation itself.[12] *Cf. Greenfield,* 432

9. Partnership by estoppel can also be established by showing a party's consent to another's representation that the party is a partner. *See* Fla.Stat.Ann. § 620.635.

10. R.5:26 (Deposition of John Hunter).

11. R.5:27.

12. The appellants contend that the testimony of John Hunter, a member of the Pinnacle Port board, demonstrates reliance. Hunter testified that he relied on the above-mentioned representations. The testimony is ambiguous, in that

the representations referred to were made on "numerous occasions"—it is not clear whether any instance of reliance preceded the stipulation. However, even if an inference is made in Pinnacle Port's favor that at least one of the relevant representations to Hunter occurred before the stipulation and that he relied on it, the evidence falls short of meeting Pinnacle Port's burden. The evidence before us indicates that Hunter only worked with NAMI on an unrelated construction complaint and took no part in the stipulation negotiations. Thus, Hunter's testimony does not create a genuine issue of

So.2d at 575 (party asserting estoppel testified to changing position specifically on account of defendant's representation). As the district court persuasively stated, the terms of the stipulation do not reflect a belief that NAMI and Orenstein were partners. While Orenstein is identified as "d/b/a Pinnacle Port Developers," other stipulation language clearly identifies NAMI as a separate entity.[13] Likewise, the stipulation names both Orenstein and NAMI in the release provision, yet only names Orenstein when identifying who is obligated under the stipulation. Common sense suggests that, if the stipulation indeed expressed what Pinnacle Port represents to have been its understanding at the time, it would have been drafted to reflect one of these alternatives: the stipulation would have released both NAMI and Orenstein for past claims, in exchange for *both* NAMI and Orenstein's promises to perform, or the stipulation would have released one or the other, as developer, in exchange for that party's obligation, as developer. Thus, the appellees argue that the effect of the stipulation is to release both Orenstein and NAMI on the strength of Orenstein's subsequent obligation.[14]

Thus, we conclude that, under either a joint venture or a partnership by estoppel theory, the evidence proffered by Pinnacle Port[15] does not create a genuine issue of material fact with respect to NAMI's being bound under the stipulation. We therefore proceed to Pinnacle Port's remaining arguments.

## IV. ESTOPPEL

Pinnacle Port next argues that the stipulation provisions can be enforced against NAMI under a theory of estoppel. Pinnacle Port argues that NAMI's representations that it was bound were sufficient to bind it; it is estopped from denying its obligations because of Pinnacle Port's reliance.

The elements of estoppel are similar to those of partnership by estoppel:

(1) a representation by the party estopped to the party claiming estoppel as to some material fact, which representation is contrary to the condition of affairs later asserted by the estopped party;

(2) a reliance upon this representation by the party claiming the estoppel; and

(3) a change in the position of the party claiming the estoppel to his detriment, caused by the representation and his reliance thereon.

*Traveler's Indemnity Co. v. Swanson,* 662 F.2d 1098, 1101 (5th Cir.1981) (citing *Davis v. Evans,* 132 So.2d 476, 481 (Fla.App.), *cert. denied,* 136 So.2d 348 (Fla.1961)).

Our resolution of this issue is guided by our earlier analysis of partnership by estoppel, with the sole difference that evidence of post-stipulation reliance is relevant. Even assuming that NAMI made the required representations orally or by its conduct, the evidence offered by Pinnacle Port falls short of creating a genuine issue of material fact with respect to the final element of estoppel, detrimental reliance.

Pinnacle Port offers the same actions in support of its having relied on NAMI's

---

material fact as to Pinnacle Port's reliance in subscribing to the stipulation.

**13.** "The association hereby gives the Developer, North American Mortgage Investors and *their* agents and employees a full and final release." R.3: Exh. A (Stipulation) (emphasis added).

**14.** The appellants argue that the only reasonable inference to be drawn from Pinnacle Port's release of NAMI is that it resulted from reliance on NAMI's being bound. In fact, the only relevant evidence in the record supports the opposite inference. The evidence in the record indicates that NAMI was in a precarious financial position at the time of the settlement negotiations. Thus, the reasonable inference is that

Pinnacle Port released NAMI because it thought it was more likely to secure repairs if Orenstein was the party upon which the stipulation imposed the obligation.

**15.** With respect to the partnership by estoppel theory, Pinnacle Port also argues that it relied on NAMI's being a partner when it extended time for the performance under the stipulation. In other words, Pinnacle Port did not attempt to hold Orenstein to the time provision of the stipulation because it believed NAMI was bound. Because this is evidence of reliance after the stipulation, it is not relevant to Pinnacle Port's claim. In any case, this evidence of reliance is not persuasive. *See* Section IV, *infra.*

representation. As discussed above, Pinnacle Port's signing of the stipulation does not show detrimental reliance. Pinnacle Port also argues that it relied on NAMI's being a partner when it extended time for the performance under the stipulation. In other words, Pinnacle Port did not attempt to hold Orenstein to the time provision of the stipulation because it believed NAMI was bound. As Pinnacle Port concedes, the reason behind its not taking action was that NAMI was performing in Orenstein's place.[16] Given this concession, Pinnacle Port's forbearance does not establish estoppel.

Florida law requires more than mere reliance. It requires reliance that causes a detrimental change of position. This action does not satisfy the requirement of an adverse change of position. Pinnacle Port has not created a genuine issue of material fact as to whether its reliance *caused* a detrimental change in position, i.e., whether it took action other than what it would have done had it not believed NAMI was obligated under the stipulation. *See Traveler's Indemnity Co. v. Swanson*, 662 F.2d 1098 (5th Cir.1981) (elements of estoppel). By way of illustration, if Pinnacle Port had relied upon NAMI, and NAMI had completed the repairs to Pinnacle Port's satisfaction, it of course would have no suit based on its not having enforced the stipulation against Orenstein. Pinnacle Port forewent taking action against Orenstein because it sought performance, and could obtain it from NAMI. Only when the repairs were completed unsatisfactorily did Pinnacle Port pursue a remedy, which is likely exactly what it would have done had Orenstein, and Orenstein alone, been bound. There is no evidence in the record that Pinnacle Port would not have extended the time for finishing the repairs if Orenstein had been performing in place of NAMI. Likewise, in terms of the illustration described above, Pinnacle Port did not detrimentally rely because it wanted two things: repairs performed, and absent that, a legal remedy.[17] Pinnacle Port did not forego

performance, up to the time it sued, and it did not forego its legal remedy, once it became dissatisfied with the extent of the performance. As the district court noted, Pinnacle Port's reliance argument would be stronger if, in the course of waiting for NAMI to perform, it had lost through the statute of limitations its right to sue Orenstein, thus changing its ultimate position.

Because Pinnacle Port has failed to create a genuine issue with respect to detrimental reliance, we conclude that summary judgment on the issue of estoppel was appropriate.

## V. PROMISSORY ESTOPPEL

Pinnacle Port also argues that NAMI is bound as a result of promissory estoppel. Under the Florida doctrine of promissory estoppel,

> a promise, which the promissor should reasonably expect to induce action or forbearance of a substantial character on the part of promissee and which does produce such action or forbearance is binding ...

*Perry Publications, Inc. v. Bankers Life & Casualty Company*, 246 So.2d 604, 605 (Fla.Dist.Ct.App.1971); *see also Crown Life Ins. Co. v. McBride*, 517 So.2d 660, 662 (Fla.1987) (describing elements of promissory estoppel and including element of *detrimental* reliance).

■ Promissory estoppel's only relevant difference from estoppel is that promissory estoppel requires reliance on a promise, rather than a representation of fact. In its promissory estoppel argument, Pinnacle Port offers the same reliance as described in the analysis of its partnership by estoppel and estoppel claims. Assuming that Pinnacle Port could create a genuine issue with respect to the promise requirement, it still would have to demonstrate the detrimental reliance about which it has previously failed to create a genuine issue of material fact. Therefore, summary judgment on this issue was appropriate.

---

**16.** *See* Brief of Appellant at 32.

**17.** Pinnacle Port could argue that performance by *Orenstein* was of particular value to it. However, Pinnacle Port's waiting to sue until after NAMI declared the repairs complete demonstrates that it was not concerned with repairs by Orenstein in particular.

## VI. ORAL CONTRACT

■ Pinnacle Port contends that NAMI made oral promises that it would repair the defects in the project. This, Pinnacle Port argues, constitutes an independent collateral agreement enforceable against NAMI.

It is unclear whether Pinnacle Port argues that an oral contract for repairs arose both before and after the stipulation. To the extent that Pinnacle Port relies on pre-stipulation promises to perform, its argument is barred by the terms of the stipulation itself, which release NAMI from any claim which existed as of the time of the release.

The release provision applies to both Orenstein and NAMI. It effects a "full and final release of all claims which have been made or could have been made ... for any and all causes of action, claims ... or other obligations ... which arose out of ... the development of Pinnacle Port." [18] Any oral contract prior to the stipulation in which NAMI promised to repair the project's construction defects would have been released by the sweeping terms of this provision.[19]

■ Pinnacle Port also alleges that NAMI made promises after the stipulation that it would complete the work, and therefore we will consider whether there is a genuine issue as to an oral contract subsequent to the stipulation. The contention that, after the stipulation was signed, NAMI promised to complete the repairs has some support in the record. In late 1982, when Pinnacle Port was considering whether to return to state court with its claims, a NAMI representative told Pinnacle Port's attorney that NAMI would "complete any work necessary in order to fully comply with the Stipulation." [20] Thus, there is a genuine issue as to NAMI's post-stipulation promises to make the repairs. We therefore turn to the question of whether there is adequate consideration to support the contract.

Under Florida law, valid consideration is a requirement for a binding contract. See Kaufman v. Harder, 354 So.2d 109 (Fla. Dist.Ct.App.), cert. denied, 359 So.2d 1215 (1978); see also 11 Fla.Jur.2d, Contracts § 56. As consideration for the contract, Pinnacle Port offers its detrimental reliance on NAMI's undertaking to perform the repairs. Detrimental reliance is valid consideration for a contract. See Crown Life Ins. Co. v. McBride, 517 So.2d 660, 663 (Fla.1987); United Companies Financial Corp. v. Whitsett, 448 So.2d 15, 16 (Fla.Dist.Ct.App.1984).

The examples of detriment offered by Pinnacle Port are within the bounds of what constitutes consideration under Florida law. Pinnacle Port suffered the detriment of its efforts to comply with its requirements under the stipulation and to verify the outcome of NAMI's efforts. It engaged in negotiations with NAMI. Also, Pinnacle Port delayed state court enforcement of the stipulation in response to these later promises. Therefore, we believe that Pinnacle Port's actions represent sufficient detriment to create a genuine issue as to consideration.

While our conclusion may appear to contradict our earlier analysis of the various forms of estoppel argued by the appellant, estoppel is rooted in equitable factors, an implicit threshold; in contrast, the consideration requirement of contract law is often satisfied with minimal consideration. Maryland Casualty Co. v. Krasnek, 174 So.2d 541, 543 (Fla.1965) (slightest detriment to promisee sufficient). Therefore, Pinnacle Port should have the opportunity on remand to demonstrate the existence of an oral contract subsequent to the stipulation.

## VII. ADOPTION

Pinnacle Port also contends that NAMI's conduct reasonably led Pinnacle Port to believe NAMI had adopted the stipulation. Pinnacle Port argues that NAMI should

---

**18.** R.3: Exh. A (Stipulation). See n. 2, supra.

**19.** Because we hold that the release provision bars enforcement of any pre-stipulation promise to repair, we need not reach the question of whether such a contract could be demonstrated in light of the parol evidence rule. See Johnson v. Johnson, 403 So.2d 1388 (Fla.Dist.Ct.App. 1981).

**20.** R.3: Exh. U.

thus not be permitted to repudiate the stipulation obligations. Pinnacle Port rests its argument on a principle of Florida law whereby a party who appears bound by a contract may be estopped from denying his obligations under the contract as against one who has relied on that appearance. *Ayala v. Murrell*, 97 So.2d 13, 15 (Fla. 1957); *Gulf Cities Gas Corp. v. Tangelo Park Service Co.*, 253 So.2d 744, 748 (Fla. Dist.Ct.App.1971).

In *Gulf Cities*, the court considered whether Gulf Cities was liable on a contract to supply gas to Tangelo Park residents. The contract provided that Fuel Gas, the parent of Gulf Cities, had the exclusive right to sell gas to residents of the Tangelo Park subdivision, in exchange for which Fuel Gas would rebate to Tangelo Park ten percent of the gross proceeds. The contract was in the name only of Fuel Gas; Gulf Cities was not a formal party. The agreement was negotiated by an attorney who stated that he represented Gulf Cities, and Gulf Cities performed the contract. The court held Gulf Cities liable, under the theory that Gulf Cities' conduct led Tangelo Park reasonably to change position on the assumption that Gulf Cities had adopted the contract.

 NAMI argues that Pinnacle Port did not detrimentally rely on any apparent adoption of the stipulation by NAMI. However, adoption requires less reliance than the forms of estoppel discussed above. While the doctrine is rooted in estoppel, *see Gulf Cities*, 253 So.2d at 748; *Barsumian v. Barsumian*, 235 So.2d 515, 517–18 (Fla. Dist.Ct.App.1970), the majority of the cases make clear that the reliance requirement may be satisfied merely by the estopped party's having accepted the other party's compliance with the terms of the contract. *See generally Billings v. City of Orlando*, 287 So.2d 316, 318 (Fla.1973); *Ayala v. Murrell*, 97 So.2d 13, 15 (Fla.1957); *Barsu-*

*mian*, 235 So.2d at 518. In other words, this doctrine requires no more reliance than that a party perform under the contract that the other party has apparently adopted.[21] While the stipulation in large part obligated Orenstein, it also imposed reciprocal obligations on Pinnacle Port. Pinnacle Port performed its obligations under the stipulation: it did not go forward with the other claims against NAMI, and it designated an on-site representative, accepted some of the repairs as complete, and in general cooperated with NAMI. *Cf. Barsumian v. Barsumian*, 235 So.2d 515 (Fla.Dist.Ct.App.1970) (mere subscription to divorce decree terms and acceptance of benefits). Therefore, the evidence creates a genuine issue of material fact as to whether NAMI is estopped from denying the obligations of the stipulation under Pinnacle Port's theory of contractual adoption.

## VIII. NEGLIGENCE

Pinnacle Port also claims that NAMI is liable in tort for negligently repairing the condominium units. It argues that NAMI is liable even if the repairs were not undertaken pursuant to a legal obligation under the stipulation agreement.

The district court, which dismissed this claim, was correct in finding that there was not sufficient injury to make out a claim of negligence, if the injury consisted solely of NAMI's failure to satisfy the requirements of the stipulation agreement.[22] However, Pinnacle Port can make out a tort claim under an entirely different theory.

 Under Florida law, one who gratuitously undertakes a course of action is nonetheless obligated to exercise due care. *Banfield v. Addington*, 104 Fla. 661, 140 So. 893 (1932); *see generally* W. Prosser, *The Law of Torts* § 56 (1971); *Fidelity & Casualty Co. v. L.F.E. Corp.*, 382 So.2d 363, 368 (Fla.Dist.Ct.App.1980).[23] As the

---

**21.** Because Pinnacle Port's argument is that NAMI adopted the stipulation subsequent to its signing by Orenstein, evidence of reliance after the stipulation is relevant to this claim.

**22.** As the district court reasoned, finding an injury under these circumstances would require that NAMI had an affirmative duty to make repairs even absent any contractual relationship with Pinnacle Port. Alternatively, it would re-

quire that NAMI's failure to completely eliminate the defects in the project's construction, once repair had begun, itself was the tortious injury. Neither contention can be sustained as a matter of tort law.

**23.** This duty is distinguished from the principle in Florida tort law, discussed by the district court, that when one does something he is not

leading case states, "[w]hen a man undertakes to act, or to pursue a particular course, he is under an implied legal obligation or duty to act with reasonable care." *Banfield,* 140 So. at 896. Therefore, even if NAMI was not bound under the stipulation, once it undertook to make repairs it was under a duty to do so non-negligently. Any action taken by NAMI that worsened the condition of the condominiums could, under this theory, constitute negligence.

NAMI also argues that Florida tort law bars recovery for purely economic losses, and therefore Pinnacle Port cannot recover in tort for contractual nonperformance. NAMI's argument misses the point. As we discuss below, the evidence supports claims of property damage, not pure economic loss. Moreover, the cases cited by NAMI are inapposite to the present case. In *Florida Power & Light Co. v. Westinghouse Electric Corp.,* 510 So.2d 899 (Fla. 1987), Westinghouse contracted to build nuclear systems for Florida Power & Light, a utility. When the utility discovered leaks in the system, it sued under various theories, including negligence. The Florida Supreme Court held that contract law was more appropriate than tort law to resolve a claim for economic damages under a contract for goods, where there is no claim of personal injury or property damage other than the damage inherent in the defective goods. *Id.* at 900; *see also AFM Corp. v. Southern Bell Telephone & Telegraph Co.,* 515 So.2d 180 (Fla.1987) (purchase of services). In the instant case, the claim involves an affirmative act by NAMI, with resulting damage to property, not mere loss due to incomplete or unsatisfactory contractual performance. Therefore, *Florida Power & Light* does not bar recovery by Pinnacle Port under the circumstances of this case.

 We now turn to the evidence offered by Pinnacle Port on the question of whether NAMI made negligent repairs. The record reveals that in repairing the walls of the condominiums, an unspecified number of metal studs were modified by splicing short, new sections to them. There is deposition testimony that this splicing diminished the structural integrity of the walls. Additionally, NAMI placed a material called Visqueen behind the stucco, to act as a water barrier. There is evidence to the effect that the Visqueen barrier, once punctured by the technique for mounting, actually concentrated moisture on the metal studs. This moisture may have accelerated the corrosion of the studs. This evidence constitutes some showing of affirmative acts by NAMI that may have negligently caused damage to the condominium units. In sum, the evidence presented by Pinnacle Port creates a genuine issue of material fact as to NAMI's negligence.[24]

## IX. CONCLUSION

Because there is no genuine issue of material fact with regard to Pinnacle Port's joint venture, partnership by estoppel, estoppel, and promissory estoppel claims, the district court did not err in granting summary judgment on those issues. However, summary judgment was inappropriate with respect to Pinnacle Port's oral contract, contract adoption and negligence claims. Therefore, we remand these three issues for further consideration.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

obligated to do, he should not be held liable for failure *to do more. Fruehauf Corp. v. Aetna Ins. Co.,* 336 So.2d 457 (Fla.Dist.Ct.App.1976) (citing *Banfield* rule with approval). *See* n. 22, *supra.*

24. NAMI contends that the repairs were acquiesced to by Pinnacle Port. While there is some evidence of this, this contention merely underscores that NAMI's negligence is a disputed issue, and we do not rule on whether such acquiescence, if proven, would bar recovery.