Richard C. BECHERER, Lawrence Milton Richard, Robert A. Horvath and Shirley L. Horvath, and Henry V. Denolf and Joann L. Denolf, individually, and on behalf of all ·others similarly situated, Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett G. Carlson, Graham C. Lount, Arni Thorsteinson, Frank Lavin, Martin Cicco, Laventhol & Horwath, Dominion Financial & Investment Corp., n/k/a Trustbank Mortgage Center, Inc., M.A. Mortenson Company, Winsor/Faricy Architects, Inc., and Midwest Title Guaranty Company of Florida, Defendants.

Civ. A. No. 89–72502.

United States District Court,
E.D. Michigan, S.D.

Aug. 7, 1992.

Amendment Filed Nov. 24, 1992.

A. Spector, Spector & Roseman, P.C., Philadelphia, Pa., and Elwood S. Simon, Elwood S. Simon & Associates, Bloomfield Hills, Mich., for plaintiffs.

Steve Gaskins, Cosgrove, Flynn, Gaskins & Haskell, Mary Yeager, Faegre & Benson, Sam Kaplan, Kaplan, Strangis & Kaplan, Minneapolis, Minn., and Jon B. Gandelot, Gandelot & Dickson, P.C., Detroit, Mich., for SSG.

Thomas G. McNeill, Dickinson, Wright, Moon, VanDusen & Freeman, Detroit, Mich., for Mortenson.

Jonathan T. Walton, Jr., Clark, Klein & Beaumont, Detroit, Mich., for Trustbank.

Douglas G. Graham, Butzel Long, P.C., Detroit, Mich., for Merrill Lynch.

Melissa Horne, Kerr, Russell and Weber, Detroit, Mich., for Winsor/Faricy.

Frank W. Brochert, Plunkett & Cooney, Detroit, Mich., for Midwest Title.

Mark T. Boonstra, Miller, Canfield, Paddock & Stone, Detroit, Mich. and Howard O. Godnick, Schulte Roth & Zabel, New York City, for Registry Hotel Corp.

Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, Eugene

Susan LaCava, Madison, Wis., for Assoc. of Unit Owners.

## INDEX OF OPINION

| Section | | Page |
|---|---|---|
| I. | Background | 760 |
| II. | Breach of Contract Claim Against SSG | 761 |
| | A. Findings of Fact | 762 |
| | B. Conclusions of Law | 765 |
| | C. Summary | 767 |
| III. | Fraud Claims Against Merrill Lynch and SSG | 767 |
| | A. Complete v. Substantially Complete Fraud Claim | 768 |
| | B. Purchase v. Lease Fraud Claim | 769 |
| | C. Rule 10b–9 and 15c2–4 Fraud Claims | 769 |
| | D. Land Sales Act Claim | 770 |
| IV. | Contract Claims Against Merrill Lynch | 771 |
| V. | Claims Against Trustbank Mortgage Center | 772 |
| | A. Contract Claims | 772 |
| | B. Tort Claims | 772 |
| | C. The *D'Oench Duhme* Doctrine | 773 |
| VI. | Claims Against Mortenson and Winsor/Faricy | 775 |
| VII. | Midwest Title | 775 |
| VIII. | Damages Resulting From Breach of FFE Agreement | 776 |
| | A. The Measure of Damages | 776 |
| | 1. Plaintiff Class' Position | 776 |
| | 2. Defendants' Position | 776 |
| | B. Out-of-Pocket Damages | 777 |

| Section | Page |
|---|---|
| IX. Conclusion | 777 |
| X. Orders | 778 |

. Furniture, Fixtures and Equipment Lease Claim
. Breach of Contract Claims on Closing of Sale
. Merrill Lynch's Motions To Dismiss Complaints
. Frank Lavin's Motion To Dismiss Complaints
. Martin Cicco's Motion To Dismiss Complaints
. Shelter Seagate Group's Motion For Summary Judgment on Fraud
Claims
. Trustbank's Motion For Summary Judgment
. Mortenson's Motion For Stay Pending and Directing Arbitration
. Winsor/Faricy's Motion For Stay Pending and Directing Arbitration
. Midwest Title's Motion To Be Dropped As Misjoined Party
. Plaintiff Class' Motion To Join Midwest Title As Defendant
. Plaintiff Class' Cross–Motion For Summary Judgment As To First
Amended Complaint

XI. Appendices
. A—Transcript of April 23, 1990 Hearing
. B—Opinion/Order of November 20, 1990
. C—Order of March 15, 1991
. D—Transcript of May 7, 1991 Hearing

## OPINION

FEIKENS, District Judge.

### I. *Background*

This case began with a lengthy complaint containing sixteen counts. It alleged that a group of 298 investors, who asked to be designated as a class, purchased unit interests in a 474–room resort hotel (The Registry Hotel), herein referred to as "the hotel," to be located on Pelican Bay in Naples, Florida, for a total price of $89,225,500. Named as defendants are a group, referred to herein as "the developer," Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson. Also named as defendants are Merrill Lynch, Pierce, Fenner & Smith, Inc.; Frank Lavin; Martin Cicco; Laventhol & Horwath, certified public accountants retained by the developer; Dominion Financial & Investment Corporation; M.A. Mortenson Company; and Winsor/Faricy Architects, Inc.

The counts captioned in the complaint are:

1. Violation of the Exchange Act, § 10(b) and Rule 10b–5;

2. Violations of the Exchange Act, § 20;

3. Violations of the Securities Act, § 12(2);

4. Violation of the Securities Act, § 15;

5. Fraudulent and negligent misrepresentation;

6. Violation of the Land Sales Act;

7. Aiding and abetting/conspiracy;

8. Violation of RICO;

9. Violation of Florida's RICO statute;

10. Breach of fiduciary duty (against named defendant[s]);

11. Breach of fiduciary duty (against named defendant[s]);

12. Breach of fiduciary duty (against named defendant[s]);

13. Malpractice/negligence;

14. Respondeat superior;

15. Breach of warranty; and

16. Breach of contract.

In managing this case, I concluded that there was a strong need for the adoption of special procedures, since the case involved complex issues, multiple parties, and difficult legal questions (Fed.R.Civ.P. 16(c)(10)).

The complaint was filed on August 21, 1989, and there followed a blizzard of motions and briefs. Between August 21, 1989 and April 23, 1990, the date on which the court was able finally to schedule a Rule 16

conference, there were ninety docket entries, comprised of discovery motions, Rule 12 and 56 motions, and supporting and response briefs.

Clearly, Rule 16 had to be vigorously applied.

A pretrial conference held on April 23, 1990 began this process. With close questioning of parties' counsel, it appeared that the complaint was bottomed on allegations of fraud and breach of contract. Three occurrences of fraud were alleged:

1. That the Private Placement Memorandum (the "PPM"), which disclosed that the W.B. Johnson Company was interested in erecting a hotel on Pelican Bay, did not say that that hotel was a Ritz–Carlton;

2. That the PPM stated that the hotel was to be furnished with approximately $13.5 million of furniture, fixtures and equipment; and that defendants, or some of them, rather than perform that contractual undertaking, leased the furniture, fixtures and equipment placed in the hotel and thereby burdened the hotel with lease payments; and

3. That fraud surrounded the October 31, 1986 closing date, when the hotel was to be "substantially completed."

That status conference on April 23, 1990, as the record amply demonstrates (*see* Appendix A), compacted the prolix allegations of fraud in the complaint to three manageable areas and, on May 15, 1990, a detailed order managing initial discovery was entered.

In motion hearings, these three occurrences were then addressed.

In an Opinion and Order dated November 20, 1990, I granted a motion for summary judgment on plaintiffs' first fraud claim. I found no fraud in the claim that the investors were not notified that another hotel to be built on Pelican Bay would be a Ritz–Carlton hotel. That Opinion, and the resulting Order, sets forth the reasons for the grant of summary judgment and is attached hereto as Appendix B.

On March 15, 1991, I entered an Order for an expedited trial. I determined that the remaining two issues of alleged fraud could be tried as breach of contract claims against the developer Shelter Seagate, Can–American Corporation, Can–American Realty Corporation, and the individual defendants Carlson, Lount and Thorsteinson (referred to collectively as "the Shelter Seagate Group", or as "SSG", or as "the developer"). In that Order I also certified a plaintiff class (attached hereto as Appendix C). Jury trial was waived.

On the second claimed issue of fraud, reformed into a breach of contract claim, *i.e.*, the decision by the developer-defendants to lease furniture, fixtures and equipment for the hotel rather than to purchase them, resulted, following a full hearing, in a grant of partial summary judgment in favor of the plaintiff class and against the developer-defendants. That ruling was made on May 7, 1991. A transcript setting forth the reasons and grounds for that grant of partial summary judgment is contained in Appendix D attached hereto, the transcript being a record of the ruling made on that date. I reserved for a future hearing a determination of the remedy for that breach.[1]

II. *Breach of Contract Claim*

In this section, the third issue, reformed as a breach of contract claim, is addressed.

The trial parties are the plaintiff class and the Shelter Seagate defendants, the developer.

Beginning in February, 1984, the plaintiff class ("the investors") entered into contracts with defendant Shelter Seagate Corporation ("SSG") for the purchase of "Hotel Units" in The Registry Hotel. Investors paid at least 10% of the purchase price as a cash down payment and applied for mortgage financing for the remainder. SSG agreed to deposit investors' down payments, notes, and executed mortgages with a designated escrow agent until construction of the Hotel Units was "substantially completed" and the sale was closed. Investors were free to cancel their purchase

---

**1.** That hearing has now been held and damages have been determined. *See infra.*

agreements until (1) they were approved for financing, and (2) they received notice from SSG that the "Minimum Subscription Level" had been attained. Thereafter, investors were "irrevocably bound" to complete their purchases.

SSG agreed, however, that if they did not "substantially complete" the hotel, and close the sale of Hotel Units, within two years from the date that investors became "irrevocably bound," investors would be given the option of rescinding their contracts with a return of all deposits, or demanding specific performance by SSG.

On October 31, 1986, SSG represented to the escrow agent that the hotel was substantially complete and that it had complied with all conditions precedent to closing the sale. The escrow agent agreed, released investors' funds ($89,225,500) from escrow and closed the sale.

In August of 1989, nearly three years later, six investors brought this lawsuit, individually and on behalf of nearly 300 similarly situated investors, seeking to rescind their contracts with SSG.

On March 15, 1991, I entered an Order scheduling an expedited trial on plaintiff class' contract claims and certifying a plaintiff class (Appendix C, *supra*). In that Order, I limited the expedited trial to deciding plaintiffs' class claims against the "Shelter Seagate Group" defendants, since that was the group with which the plaintiff class had contracted. I pointed out that, if there were breaches of contract, such issues could be tried in far less time and "would avoid unnecessary costs of trial." Plaintiff class filed an amended complaint stating breach of contract claims, but expressly reserved the right to litigate their fraud claims in the future.

The expedited trial addressed this issue: Whether SSG, by closing the sale of Hotel Units to the investors, breached its agreement to *substantially complete* the hotel

within two years from the date investors became bound.[2]

## A. *Findings of Fact*

Between February, 1984, and April, 1985, plaintiff class entered into contracts with SSG for the purchase of Hotel Units in The Registry Hotel, a non-residential, luxury condominium resort complex which SSG planned to develop at Pelican Bay in Naples, Florida. Each Hotel Unit cost between $179,500 and $278,000 and included a fully furnished hotel room or suite, a percentage interest in the hotel's common areas, and a percentage interest in the hotel's future profits. Plaintiff class appointed SSG as their agent, authorizing it to rent hotel units, collect pool revenues, pay operating expenses, and distribute cash dividends to plaintiff class at regular intervals.

Prior to making their purchases, investors (herein also known as "plaintiff class") were given a Private Placement Memorandum (PPM) which described the offering in detail. In the PPM, investors were advised that Hotel Units were business investments with distinct tax shelter benefits. As long as investors used their units for not more than 14 days in any taxable year, the units were considered business investments for tax purposes. As such, under the tax laws then in effect, investors were entitled to claim yearly tax deductions based on the "depreciation" value of their units, and for any interest on mortgage financing. To the extent that depreciation and interest deductions for any taxable year exceeded the investors' share of the hotel's Net Operating Income, an investor would realize a tax "loss" which could be off-set against income from other sources, thus producing tax savings. In short, investors were aware that even if the hotel performed poorly during its first years of operation, the investment was beneficial as a mechanism for sheltering other income from taxation.

---

**2.** The expedited trial was held in May, 1991. The apparent anomaly between my ordering an expedited trial and the delay in issuing this Opinion is explained by noting that all the parties to this lawsuit were negotiating a global settlement during the intervening period, and indeed did reach such a settlement. However, under the terms of the settlement, the number of plaintiff class members who elected to opt out of the proposed settlement was sufficient to scuttle the agreement.

Testimony at trial demonstrated that the tax shelter aspect of this investment was a significant factor in enticing the investors to purchase hotel units. This is highlighted by the fact that the PPM and its supplements devoted a considerable amount of space to the tax consequences of the investment. Because the tax shelter aspect was a significant factor in this investment, the alleged under-performance of the hotel, of which the investors now complain, would have benefited them by providing greater tax losses to off-set against their other income.

Notably, the tax shelter laws changed shortly after the instant sale was closed. Under the new laws, investors are no longer entitled to off-set Registry Hotel losses against their other income. This materially diminishes the tax benefits of plaintiff class' purchases.

The purchase agreement between SSG and each member of plaintiff class is set forth in a document entitled "Unit Sale Agreement," and in other documents incorporated by reference therein. Pursuant to paragraph 2 of the Unit Sale Agreement, investors agreed to pay SSG a cash down payment equaling at least 10% of the purchase price, and agreed to apply for mortgage financing for the remainder. SSG agreed to place down payments, mortgages, and notes in an escrow account with a designated escrow agent, to be held until SSG fully satisfied the conditions precedent to closing the sale.

The following provisions of the Unit Sale Agreement controlled SSG's right to close the sale:

Paragraph 4 states:

*Completion Date.* Seller shall substantially complete construction of the Hotel not more than two years after this Agreement becomes binding on the Purchaser as such two year period may be extended under the Interstate Land Sale Full Disclosure Act.

Paragraph 5 states:

*Closing of Title.* The closing of title shall be held within a reasonable time after completion of construction of the Hotel Unit, at the office of the escrow agent. . . .

Paragraph 8 states:

*Default.* Seller shall be in default hereunder if Seller fails to close the sale pursuant to Section 5 within two years after this Agreement becomes binding on Purchaser, as such two year period is defined in the federal Interstate Land Sale Full Disclosure Act and the regulations and guidelines promulgated thereunder. Purchaser's remedy against Seller for Seller's default hereunder shall be either to obtain a refund of all deposits made pursuant hereto (together with interest earned thereon, if any) whereupon this Agreement and the parties' rights hereunder shall terminate, or to seek specific performance of this Agreement, at the Purchaser's election.

Exhibit B to the Escrow Agreement (incorporated by reference into the Unit Sale Agreement) is entitled "Closing Requirements" and denominates those conditions that had to be satisfied before the sale closing could take place. Exhibit B provides in relevant part:

The requirements for closing or escrow and title under the Agreement and the applicable contract [identified as the Unit Sale Agreement], which must first be completely satisfied or met are:

2. Receipt of Developer's written assignment of all existing warranties, books and records of the condominium owners association, plans, specifications, and all certificates or permits obtained or required with respect to the construction, occupancy and operation of the Hotel, to the condominium owners association and to the Purchaser, as appropriate.

I find that investors became "irrevocably bound" to complete their purchases on February 15, 1985, the day their funds were delivered into escrow by SSG, and that SSG therefore had until February 15, 1987 to substantially complete the hotel and close the sale. Because SSG elected to close the sale on October 31, 1986, I find that SSG waived whatever time remained in the two-year completion period and obligated itself to deliver a substantially complete hotel by

the closing date, October 31, 1986. *See* Appendix D (Transcript of May 7, 1991 hearing).

Photographic, documentary and testimonial evidence of the physical and operational condition of the hotel on or about October 31, 1986, the date of the closing of sale and title, demonstrated that the hotel was not substantially complete at that time. Heavy construction was proceeding on the top floors of the hotel; some rooms on the top floor had no walls while others had metal studs; some rooms in the hotel lacked carpeting, wall coverings, and furniture, fixtures and equipment; on some floors, metal studs and drywall were just being erected. There was an absence of fully assembled furniture from the top floors down through floors 4 and 5, and any furniture that was present was in boxes or stacked throughout the rooms and in the corridors. The ballrooms, restaurants, nightclub and commercial areas of the hotel were still in an incomplete state of construction on the date of the sale closing.

On the closing date, SSG had not obtained all certificates necessary to operate the hotel. It had obtained a partial certificate of occupancy and a partial certificate of fire compliance, but these certificates were predicated on SSG's assurance that no guests would be allowed in the hotel. Similarly, although SSG had obtained an Architect's Certificate of Substantial Completion, this certificate was limited to the work of the general contractor, and did not pertain to the entire hotel.

After the October 31, 1986 closing, construction and finishing work continued. On December 2, 1986, Deputy Fire Chief Rodgers issued a Notice of Fire Compliance which permitted guests to occupy certain limited areas of the hotel, including the rooms on floors 3–14. On December 5–6, 1986, the hotel received its first guests, a meeting of the Naples Board of Realtors. At that time, one of the hotel's three restaurants was open; the nightclub, Garrett's, was not open. Approximately 50–75 guest rooms were used during the weekend of December 5–6, 1986. On or about December 15, 1986, 24 more guest rooms on floors 3–11 were made available. In early January, 1987, there was a function for approximately 75–100 investors at the hotel. In March, 1987, the hotel hosted a large gathering of "meeting planners" with approximately 150–200 overnight guests. By that time the hotel was substantially complete.

Plaintiff class retained Phillip Levin, a management consultant, to determine whether the hotel lost money due to the delay in substantial completion. Levin testified that he (1) reviewed the financial statements of The Registry Hotel for December, 1986, and the quarterly statements for 1987 to ascertain the hotel's performance during these periods; (2) reviewed SSG's projections in the PPM and supplements thereto to determine how the developer predicted the hotel would perform; (3) reviewed the performance of competitive hotels in the Naples area to see how they performed during this period; (4) reviewed the economy in Naples during that period of time; and (5) reviewed the reputation of The Registry Hotel Corporation which was managing the hotel for SSG.

Levin testified that the hotel under-performed during the first quarter of 1987 because it only achieved a 53% occupancy rate. He testified that it should have achieved a 72% occupancy rate during this period, given the strong demand for hotel rooms in the area (Levin noted that the Ritz Carlton Hotel at Pelican Bay was 100% occupied during this period), and given the competent management of the Registry staff. Levin testified that the hotel did not perform as he would have expected for one of two reasons. "Either the rooms weren't available for the guests, or guests for some reason chose not to stay at this hotel." He concluded that because of the delay in substantial completion, and attendant construction problems, the hotel was unable to attract the number of guests it otherwise could have. Based on Levin's analysis, plaintiff class claims an aggregate loss of over $7 million.

Levin's testimony was contradicted by several witnesses. Philip Wood, a guest on December 5 and 6, 1986, testified that his

stay at the hotel was very pleasant. Terri Autrey and Jim Knauff of the Registry's sales staff testified that no prospective guest, group or transient, was turned away during this period.

Moreover, sales figures for the hotel show that its gross revenues for the first five months of 1987 were $11,850,000, while gross revenues for the same months of 1988 were $13,357,000. The relative similarity of these figures suggests that if the hotel did "under-perform" in 1987, it also under-performed in 1988, at a time when it was substantially complete. In fact, the hotel actually generated more revenue in January of 1987 ($2,039,070), when it was not substantially complete, than it did in January of 1988 ($1,877,649), when it was. These facts negate plaintiff class' argument that the hotel lost money in 1987 due to the delay in substantial completion.

Levin conceded that he did not compare The Registry Hotel's performance during its first months of operation to the performance of other local hotels, such as the Ritz Carlton, during their first months of operation.

I find that Levin's testimony is not credible. His analysis is based on assumptions that are not adequately supported by factual data and was refuted by the testimony of Registry sales staff.

### B. *Conclusions of Law*

This court's jurisdiction and venue over the subject matter of this trial are based on Section 27 of the Securities Exchange Act of 1934; the federal securities law subject matter of the original complaint, as amended by the First Amended Complaint (for breach of contract); ancillary and pendent jurisdiction; and the court's Opinion and Order dated December 14, 1990.

The Shelter Seagate Group defendants, through SSG, entered into a series of contracts with each member of the plaintiff class for the sale of one or more Hotel Units in The Registry Hotel. The terms and conditions of the agreement are contained in Unit Sale Agreements executed between plaintiff class and SSG, and the documents incorporated therein by refer-

ence. Pursuant to paragraph 19 of the Unit Sale Agreement, the agreement is to be construed according to Florida law.

Pursuant to paragraph 1 of the Unit Sale Agreement, SSG agreed to sell and convey, and plaintiff class agreed to purchase, fully furnished, non-residential resort condominium Hotel Units of The Registry Hotel at Pelican Bay, including an appurtenant interest in the income-producing Commercial Units of the hotel, percentage ownership interest in fee simple in the land on which the hotel is situated and the other common elements of the hotel, and a management agreement appointing SSG as the agent of the Hotel Unit Purchaser to manage and operate such Hotel Units and investors' undivided interest in the Commercial Units as part of the hotel.

Pursuant to paragraph 4 of the Unit Sale Agreement, defendants agreed to substantially complete construction of each Hotel Unit not more than two years after each Unit Sale Agreement became binding on purchasers "as such two year period may be extended under the Interstate Land Sales Full Disclosure Act."

Pursuant to paragraph 20 of the Unit Sale Agreement and page 42 of the PPM, I found that the agreement became binding on purchasers on February 15, 1985, the date their down payments, mortgages, and notes were closed into escrow. I found that defendants thus had until February 15, 1987 to substantially complete the hotel, but waived that right by electing to close on October 31, 1986. In order to comply with paragraph 4 of the Unit Sale Agreement, the hotel had to be substantially complete by October 31, 1986.

Pursuant to paragraph 5 of the Unit Sale Agreement, defendants agreed to "complete" construction of the hotel before closing the sale. I find that the word "complete" means "substantially complete" when read together with paragraphs 4 and 8 of the Unit Sale Agreement. Therefore, I find that in order to comply with paragraph 5 of the Unit Sale Agreement, defendants had to substantially complete the hotel prior to closing the sale.

■ Substantial completion of the hotel meant that the Unit Owners could utilize the property in accordance with its intended use, *i.e.,* a working business ready to be occupied and used by guests and to generate rent. *See J.M. Beeson Co. v. Sartori,* 553 So.2d 180 (Fla.App. 4 Dist.1989).

Plaintiff class has the burden of proving that the hotel was not substantially complete at the time of closing on October 31, 1986, and that they were damaged thereby. SSG has the burden of proving that, in the event the hotel was not substantially complete as of October 31, 1986, their breaches of contract were not material. *See* Transcript of May 7, 1991 hearing.

■ As a result of closing the sale of the hotel on October 31, 1986, defendants breached the contract in the following manner.

Paragraph 4 of the Unit Sale Agreement was breached because on October 31, 1986, the hotel was not capable of use for its intended purpose, *i.e.,* a working business ready to be occupied by guests, and therefore was not substantially complete within two years after each investor's Unit Sale Agreement became binding.

Paragraph 5 of the Unit Sale Agreement was breached because defendants closed title prior to substantially completing construction of the Hotel Unit.

Paragraph 2 of Exhibit B to the Escrow Agreement ("Closing Requirements") was breached because defendants failed to obtain by closing date all "certificates or permits ... required with respect to the construction, occupancy and operation of the hotel."

These conclusions lead inevitably to the question: How were the members of the plaintiff class damaged?

■ I conclude that plaintiff class did not carry their burden of proving that they were damaged as a result of the aforementioned breaches. In a case such as this, where the damages claimed are lost profits, plaintiff class cannot rely on speculation and conjecture, but must prove with reasonable certainty the amount of their actual loss. *Royal Typewriter Co. v. Xero-graphic Supplies,* 719 F.2d 1092 (11th Cir. 1983). *See, also, Beverage Canners, Inc. v. Cott Corp.,* 372 So.2d 954, 956 (Fla.Dist. Ct.App.1979). Additionally, plaintiff class must prove with reasonable certainty that their damages "flowed as the natural and proximate result of the claimed breach." *See Royal Typewriter,* 719 F.2d at 1105 (quoting *Aldon Industries, Inc. v. Don Myers & Associates, Inc.,* 517 F.2d 188, 191 (5th Cir.1975).

■ This, plaintiff class cannot do, as I point out in my findings of fact. Florida law, which governs this dispute, recognizes two methods of proving lost profits: (1) the before-and-after theory and (2) the yardstick test. *See G.M. Brod & Co., v. U.S. Home Corp.,* 759 F.2d 1526, 1539 (11th Cir.1985). The before-and-after theory requires a comparison between the profits generated by a business before and after the claimed breach. *Id.* at 1536. The yardstick test consists of a study of the profits of business operations that are closely comparable to plaintiff class' to determine whether plaintiff class indeed lost profits as a result of the claimed breach. *Id.* Here, there is a lack of comparability; and, since the estimates depend on too many variables, plaintiff class cannot rely on the yardstick rule, as they have not met their burden of showing lost profits to a reasonable degree of certainty. *See, supra, Beverage Canners,* 372 So.2d at 956; *Royal Typewriter,* 719 F.2d at 1105.

■ Application of the "before-and-after" test to this case requires a comparison of the hotel's performance during its first few months of operation (when it was not substantially complete) and its performance during an analogous subsequent period (when it was substantially complete). Defendants presented evidence at trial which showed that the hotel generated $11,850,-000 in revenues for the first five months of 1987, and $13,357,000 for the first five months of 1988, a difference of only $1,507,000. It was also shown that the hotel actually generated more revenue in January, 1987 than it did in January, 1988. This evidence refutes plaintiff class' claim

that the hotel's poor performance in 1987 was due to the delay in substantial completion.

■ Plaintiff class similarly fails to prove lost profits under the so-called "yardstick" test. Plaintiff class' expert, Levin, compared The Registry Hotel's actual performance during its first months of operation with the performance of other luxury hotels in and around Naples during the same months, and found that hotels such as the Ritz Carlton were 100% percent occupied while The Registry Hotel was only 53% occupied. He concluded that given the obvious local demand for luxury hotel rooms, The Registry Hotel should have achieved a minimum occupancy rate of 72% in the first quarter of 1987. Its failure to do so, he concluded, was due to either the lack of available rooms or to the fact that The Registry Hotel was not in "first class" condition at the time.

Levin's assessment was refuted by Registry hotel staff persons who testified that no prospective guest was turned away during this period for lack of available rooms. Levin's analysis also fails to give sufficient weight to The Registry Hotel's status as a newcomer to the local market. In order to assess whether The Registry Hotel actually under-performed during its first months of operation, Levin should have compared The Registry's initial performance with the initial performance of other luxury hotels in the Naples area.

For example, if Levin had shown that the Ritz Carlton's initial performance significantly exceeded The Registry Hotel's initial performance, and that both opened under similar market conditions, he may have come considerably closer to raising an inference that The Registry Hotel significantly under-performed during its early months. He would still have to show that the under-performance was due to the delay in substantial completion, and not to other possible factors, such as poor management by Registry staff. Based on the testimony adduced at trial, I find that Levin did not present sufficient evidence to make the latter finding.

■ Because plaintiff class has not shown that they were damaged by defendants' breach, and defendants have shown that the breach is not material, plaintiff class is not entitled to either rescission or damages. "It is elementary that the mere breach of an agreement which causes no loss ... will not sustain a suit for damages, much less rescission." *See, e.g., Burger King v. Mason,* 710 F.2d 1480, 1489–90 (11th Cir.1983) (quoting *Block v. City of West Palm Beach,* 112 F.2d 949, 952 (5th Cir.1940). Plaintiff class argues that paragraph 8 of the Unit Sale Agreement gives them an unqualified right to rescission. I do not agree. As the U.S. Court of Appeals for the Eleventh Circuit stated:

[A]lthough as a general rule parties to a contract may strictly enforce its [termination] terms, and the courts will not rewrite an agreement to undo the consequences of a bad bargain, *see, e.g., Sapienza v. Bass,* 144 So.2d 520 (Fla.Dist. Ct.App.1962), the Florida Courts do not blindly sanction unilateral termination of contracts when a default causes no harm to the party seeking to avoid performance.

*Burger King,* 710 F.2d at 1490.

The hotel which plaintiff class purchased may not be as profitable as they expected, nor the tax shelter they envisioned, but that is an investment risk they knowingly took. This court will not relieve them of a bargain they now consider unwise.

### C. *Summary*

I conclude that the SSG defendants breached their contracts with plaintiff class by closing the sale of Hotel Units to the investors before the hotel was substantially complete. However, because plaintiff class had no ascertainable economic loss as a result of defendants' breach, plaintiff class is not entitled to damages or to rescission.

### III. *Fraud Claims Against Merrill Lynch and Shelter Seagate—Motions To Dismiss and For Summary Judgment*

Plaintiff class alleges three fraud claims against Merrill Lynch and SSG pursuant to Rule 10b–5 of the Securities Exchange Act,

common law fraud, and negligent misrepresentation. In addition, plaintiff class alleges that Merrill Lynch, SSG, Mortenson, and Winsor/Faricy violated the Land Sales Act. These allegations are now addressed in response to motions to dismiss and for summary judgment.

### A. Complete v. Substantially Complete Fraud Claim

Plaintiff class claims that Merrill Lynch and SSG made material misrepresentations of the requirements for closing of title. They allege that Merrill Lynch and SSG represented to the investors that the hotel had to be *fully completed* prior to closing. In support of this fraud claim, they point to the Private Placement Memorandum, Merrill Lynch Marketing Guide, and affidavits of former Merrill Lynch sales agents.

■ The short answer to this claim is that I have already held that the Unit Sale Agreement only required SSG to substantially complete the hotel prior to closing. These defendants could not have defrauded the investors by representing the transaction could only be closed upon the complete completion of the hotel because they, in fact, represented the opposite, that the closing could occur upon substantial completion.

Plaintiff class nevertheless points to the PPM, and argues that it states the closing would not occur until the hotel was completely complete. The PPM says no such thing. Page 3 of the PPM states that the "closing of the sale of the Hotel Interests is subject to various conditions including completion of the Hotel...." However, this statement falls under the heading "MEMORANDUM SUMMARY," which indicates reference should be made to the table of contents for direction to more detailed information in the body of the memorandum. The table of contents, under "closing of sale," directs the reader to page 42. Page 42 of the PPM makes only an oblique reference to the degree of completeness required prior to the closing, but it is telling: "After all required funds and documents have been deposited with Escrow Agent, the deed for Investor's Hotel Unit from SSG to Investor ... shall be recorded and ... copies of ... the Architect's Certificate of Substantial Completion ... shall be forwarded to Investor, which will complete the closing of the sale as far as the Investor is concerned."

Plaintiff class next points to the 79 form affidavits they submitted that essentially say that if each investor had discovered prior to the closing that SSG was only required to substantially complete the hotel, each would have terminated his or her subscription. However, when the plaintiff class signed Unit Sale Agreements, they did indeed "discover" what the requirements were regarding completeness, since paragraph 4 contains the operative "substantially complete" language.

Plaintiff class also claims that these defendants, through the Merrill Lynch sales representatives, orally misrepresented that the closing could not occur unless the hotel was completely complete. Plaintiff class ignores the fact that the Unit Sale Agreement they signed contains a merger and integration clause (paragraph 13), stating explicitly that the purchaser acknowledges he or she has not relied on any other representations made by the seller or seller's agent; and that the PPM, in bold letters, states that oral representations cannot be relied upon, and that any representation not contained in or beyond the statements in the PPM is made without authority. *See Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317 (7th Cir.1988) (oral statements are irrelevant if adequate written disclosures are given prior to closing).

Last, I point out again that even though I find there was no fraud in the representations made as to the closing requirements regarding completeness, I have already held that the breach of contract in this regard in no way damaged the plaintiff class. I conclude that there is no evidence whatever of fraud in the closing of the sale of the hotel, even though the hotel was not substantially complete at that time.[3]

---

**3.** Plaintiff class' other fraud allegations against the defendants are equally unavailing and do

Accordingly, motions to dismiss and for summary judgment as to these claims must be granted.

### B. *Purchase v. Lease FFE Fraud Claim*

Plaintiff class claims that Merrill Lynch and SSG materially misrepresented to investors that SSG would purchase the furniture, fixtures, and equipment ("FFE") for the hotel, when both knew that SSG intended to lease certain FFE items. They allege that this conduct violated Rule 10b–5 of the Securities Exchange Act, common law fraud, and negligent misrepresentation.

On May 7, 1991, I granted partial summary judgment in favor of plaintiff class on the breach of contract issue. (*See* Appendix D). I found, as a matter of law, that SSG breached its agreement to convey a fully furnished hotel to investors. A hearing, in order to determine damages for that breach, was held on July 16, 1992. A discussion of those damages is found in Section VIII. of this Opinion.

 The FFE fraud claim is not cognizable. Under both the securities law and state common law there can only be one recovery for one injury. In this case, plaintiff class was awarded damages for SSG's breach of the agreement to convey a fully furnished hotel to investors. They cannot now claim additional damages for the same injury.

Section 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), prevents a party from receiving double recovery for a security law violation. That section provides:

> The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity, but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the acts complained of.

Similarly, the common law fraud and negligent misrepresentation claims are also not merit further discussion.

not cognizable because a party is only entitled to one recovery for one injury. That is:

> A plaintiff who alleges separate causes of action is not permitted to recover more than the amount of damage actually suffered. There cannot be double recovery for the same loss even though different theories of liability are alleged in the complaint. Thus, a plaintiff who recovers the full amount of damages for the breach of contract cannot recover damages in tort unless he alleges and proves the existence of additional damages attributed solely to the tort.

22 Am.Jur.2d, Damages § 35. *See also Kewin v. Mass. Life Ins. Co.*, 79 Mich.App. 639, 653, 263 N.W.2d 258, 265 (1977), *aff'd in part and rev'd in part on other grounds*, 409 Mich. 401, 295 N.W.2d 50 (1980) ("If a plaintiff seeks to recover in both contract and tort, he may not recover the same damages under both theories.")

 This is not a case where plaintiff class is entitled to additional damages. Even if the FFE fraud claim was cognizable, plaintiff class is not entitled to rescission or punitive damages. Rescission is not an appropriate remedy where, as here, the remedy at law is adequate. 37 Am.Jur. 2d, Fraud and Deceit § 323, § 325. Similarly, punitive damages are only allowed where the alleged fraud is malicious, deliberate, gross, or wanton. *Id.* at § 347. There is no evidence of malicious, deliberate, gross, or wanton fraud in this case.

Thus, since plaintiff class will recover damages for the breach of contract claim with respect to FFE, they cannot recover damages pursuant to the securities law, common law fraud, or on negligent misrepresentation theories of liability. Thus, the FFE fraud claims must be dismissed on both motions to dismiss and for summary judgment.

### C. *Rule 10b–9 and 15c2–4 Fraud Claim*

Plaintiff class claims that Merrill Lynch violated Rule 10b–9 and 15c2–4 of the Secu-

rities Exchange Act, by allowing the closing of title to take place on October 31, 1986 despite their knowledge that all conditions for closing were not met.

They argue that Rules 10b–9 and 15c2–4 require a broker participating in a distribution, in which payments are not to be made until certain events or contingencies occur, to take specific steps to ensure that the issuer does not receive any funds from investors until all contingencies are fully satisfied. Here, they claim that these rules require Merrill Lynch to ensure that investors' funds were not released from escrow until all closing requirements were met, including completion of the hotel.

Plaintiff class misconstrues the applicability of these rules. They relate to "all or nothing" or "part or nothing" offers. According to the terms of an "all or nothing" offering, if within a specified period there is not a full subscription to all shares being offered, the offer is cancelled. Similarly, in a "part or nothing" offering, a refund will be made to subscribers if less than a specified portion of the offering has been subscribed to. Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 6.3, at 273 (2d Ed.1990).

Rule 10b–9 provides that an issuer entering into one of these types of offerings must be specific as to the offering price, duration of the offer, and the amount of the securities that must be sold to make the offering effective, or the offering is considered a "manipulative or deceptive device" in violation of Section 10(b) of the Securities Exchange Act. Rule 15c2–9 provides that it is unlawful for a broker or dealer to engage in these offers unless the funds are placed into a separate bank account until all relevant contingencies have occurred, *i.e.*, the minimum subscription level is met.

Thus, Rules 10b–9 and 15c2–4 protect investors' funds when securities are sold subject to a minimum sales condition. Merrill Lynch satisfied these rules on February 15, 1985, when the minimum sales conditions were met and the escrow was closed, thus irrevocably binding the investors. The conduct that plaintiff class claims violated these rules occurred at or near the October 31, 1986 closing of title. Rule 10b–9 and 15c2–4 do not apply to Merrill Lynch's conduct, which occurred after the February 15, 1985 closing of escrow. Thus, plaintiff class' Rule 10b–9 and 15c2–4 fraud claim must be dismissed on Merrill Lynch's motion to dismiss.

## D. Land Sales Act Claims

In their complaint, plaintiff class alleges a violation of the Federal Interstate Land Sales Full Disclosure Act ("Land Sales Act" or "the Act"), 15 U.S.C. § 1701, *et seq.* The Land Sales Act, section 1703(a)(2), makes it unlawful for any developer or agent to defraud to deceive a purchaser with respect to the sale of any nonexempt lot. Plaintiff class also alleges a violation of section 1707 for the failure to provide them with a property report prior to their signing of the Unit Sale Agreements and prior to their receipt of the deeds at the closing of sale and title on October 31, 1986.

Defendants assert that sale of the Hotel Units is exempt from the Land Sales Act under section 1702(a)(2), which provides that the Act does not apply to "the sale or lease of land under a contract obligating the seller or lessor to erect [a residential, commercial, condominium, or industrial] building thereon within a period of two years." Thus, the sale of the Hotel Units is exempt from the Land Sales Act if SSG is obligated to complete the hotel within two years of the sale of the units.

Plaintiff class argues that the two-year period begins to run when the sale of the hotel interests occurred, and that the sale occurred when the purchasers signed the Unit Sale Agreements. But case law provides that the two-year period during which the seller must complete the building begins when the contract becomes legally binding upon both parties.

The U.S. Housing and Urban Development ("HUD") Guidelines provide that the section 1702(a)(2) exemption requires the seller to finish the building within two years from the date the purchaser signed

the contract. *Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act*, 44 Fed.Reg. 24,010, 24,012 (April 23, 1979). However, HUD Guidelines equate "signing" the contract with "entering a contract and incurring an obligation" for purposes of this exemption.

In *Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1449 (11th Cir.1985), the court held that "for the purposes of the ILSFDA [Land Sales Act] the 'sale' takes place at the time the purchaser signs the contract *and incurs an obligation.*" (emphasis added). *See also Markowitz v. Northeast Land Co.*, 906 F.2d 100, 104 (3rd Cir.1990). ("[F]or the purposes of the Act the sale occurs when the purchaser signs the sale agreement and incurs an obligation.")

■ The position that the time of the "sale" for purposes of the Land Sales Act is the time the contract becomes legally binding is also supported by a reasonable construction of other provisions of the Act. Under section 1703(b), the purchaser can revoke the sale of a lot within 7 days of the signing of the contract. In addition, under section 1703(c), the purchaser can revoke the sale up to two years after the signing of the contract if the Act is violated. The phrase "signing of the contract" means the time that the purchaser becomes legally bound, or these revocation provisions would be meaningless.

In this case, paragraph 4 of the Unit Sale Agreement provides that:

Delivery of the hotel units will be made no more than two years after the Investor's subscription for his hotel units becomes binding as such two year period is defined in the Federal Land Sales Full Disclosure Act and the regulations promulgated thereunder.

Plaintiff class signed the Unit Sale Agreements between February and October of 1984. These agreements did not become legally binding until February 15, 1985, when the investors became irrevocably bound according to the terms of the Unit Sale Agreement. Because neither party was legally bound under the Unit Sale Agreements until February 15, 1985, there was no "sale" for the purposes of the Land Sales Act until that date. Because the Unit Sale Agreement obligated the Seller SSG to erect the hotel within two years of that date, this transaction is exempt from the Land Sales Act. Thus, plaintiff class' Land Sales Act claims must be dismissed.

## IV. *Contract Claims Against Merrill Lynch—Motions To Dismiss*

Plaintiff class' First Amended Complaint raises two contract claims against Merrill Lynch. First, they allege that Merrill Lynch violated an implied covenant of good faith and fair dealing. Specifically, they claim that Merrill Lynch breached this covenant by wrongfully closing units into escrow on February 15, 1985 before the investors received notice of their mortgage approval from Dominion Financial & Investment Corp. (n/k/a Trustbank Mortgage Center, Inc.), and by wrongfully closing title on October 31, 1986 because SSG had not substantially completed the hotel.

■ The implied covenant of good faith and fair dealing is not applicable in this case. It applies only "where a party to a contract makes the manner of its performance a matter of its own discretion". *Burkhardt v. City National Bank*, 57 Mich.App. 649, 652, 226 N.W.2d 678 (1975). Where the contract itself defines the manner of performance, the performance is not subject to the implied covenant of good faith and fair dealing. *General Aviation, Inc. v. Cessna Aircraft*, 703 F.Supp. 637 (W.D.Mich.1988), *aff'd in part and rev'd in part on other grounds*, 915 F.2d 1038 (6th Cir.1990).

■ In this case, Merrill Lynch did not exercise any discretion with respect to closing the units into escrow on February 15, 1985. The Unit Sale Agreement outlined the conditions that had to be met before investor funds could be released into escrow. Because Merrill Lynch did not have discretion regarding the performance of this agreement, the implied covenant of good faith and fair dealing is not applicable. The same reasoning applies with regard to the closing of title on October 31,

1986. It was Midwest Title Guaranty Company of Florida ("Midwest Title"), the escrow agent, who performed the duties related to the closing of title. Merrill Lynch did not exercise discretion in performing duties related to the closing of title. Thus, the implied covenant of good faith and fair dealing contract claim is dismissed.

 Second, plaintiff class alleges that Merrill Lynch entered into a joint venture with SSG, making it vicariously liable for their breaches of contract. The elements of a joint venture are:

1. An agreement reflecting an intention to engage in a joint venture;
2. a joint undertaking of;
3. a single project for profit;
4. a sharing of profits as well as losses;
5. a contribution of skills or property by the parties; and
6. a community of interest in and control over the subject matter of the enterprise.

*Pinnacle Port Community Association v. Orenstein*, 872 F.2d 1536, 1539 (11th Cir. 1989) (Fla. law). *See also Meyers v. Robb*, 82 Mich.App. 549, 557, 267 N.W.2d 450 (1978).

 I hold that there was no joint venture between Merrill Lynch and SSG. Where the parties' agreement is embodied in a written contract, the parties' intent is determined from that contract. *Hyman v. Regenstein*, 258 F.2d 502, 512 (5th Cir. 1958) (Fla. law), *cert. denied*, 359 U.S. 913, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959). *See also Moore v. Campbell Foundry*, 142 Mich.App. 363, 367, 369 N.W.2d 904 (1985). The agency agreement between Merrill Lynch and SSG does not indicate any intent on the part of either party to form a joint venture. To the contrary, the clear and unambiguous intent of the agency agreement is to make Merrill Lynch the exclusive sales agent of the offering. There is no evidence of an agreement between Merrill Lynch and SSG reflecting an intention to engage in a joint venture. Thus, the joint venture contract claim against Merrill Lynch is dismissed on its motion.

### V. *Claims Against Trustbank Mortgage Center—Motion For Summary Judgment*

Plaintiff class argues they have adequately alleged and submitted evidence to support their claims of separate, independent tort and contract actions against Dominion Financial & Investment Corp., n/k/a Trustbank Mortgage Center, Inc., ("TMC"). TMC has moved for summary judgment on plaintiff class' original complaint and first amended complaint.

#### A. *Contract Claims*

 Plaintiff class contends that a contractual obligation existed between them and TMC regarding how and when the escrow would be closed. Pursuant to the Unit Sale Agreement and the PPM, each investor agreed to apply for financing with TMC for the purchase of his or her hotel interest. Accordingly, each investor submitted a mortgage loan application to TMC. To this point, plaintiff class' argument is sound. However, they then take a remarkable leap and assert that pursuant to the PPM, TMC agreed that it would not fund investors' mortgage loans until such time as all the closing requirements set forth in the PPM and escrow agreement were fully satisfied. What is missing, of course, is any allegation that TMC was a contractual party to the PPM or escrow agreement. They were not; and the leap from the mortgage loan applications and loan commitments—where TMC was a contractual party—to the PPM and escrow agreement—where TMC was not a contractual party, is one of faith only, and one that this court is unwilling to make.[4]

#### B. *Tort Claims*

Plaintiff class also asserts they have valid claims against TMC for the torts of

4. Plaintiff class also charges TMC with liability under a "joint venture" theory, but fails to produce any evidence of an agreement to share profits or a duty to share losses, nor any evidence that TMC exercised joint control over the project, two of the four elements necessary to establish a "joint venture." *Pinnacle Port Community Association, Inc. v. Orenstein*, 872 F.2d 1536 (11th Cir.1989).

securities fraud, Land Sales Act fraud, common law fraud, negligent misrepresentation and conversion. The Land Sales Act fraud claim as to all defendants has already been addressed and dismissed. As for the remaining claims, there are equally insurmountable obstacles to plaintiffs' recovery, and I now turn my attention to the principal one, the *D'Oench, Duhme* doctrine.[5]

### C. *The D'Oench Duhme Doctrine*

Simply put, *D'Oench* and its progeny completely bar plaintiff class' claims against TMC. In *D'Oench, Duhme v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), a borrower gave a promissory note to a bank, but received no loan in return. The parties orally agreed the bank would not enforce the note. When the bank failed, the Federal Deposit Insurance Corporation ("FDIC") acquired the note and attempted to enforce it. The borrower defended on the basis of lack of consideration. The U.S. Supreme Court held the borrower could not raise this defense against FDIC because the "secret agreement" was not part of the bank's records. The Court held as a matter of public policy that FDIC must be able to rely on a bank's records to make quick, accurate evaluations of a bank's financial condition. *See Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). This ability is essential to properly regulate and safeguard the nation's banking system.[6] *Id.*

The *D'Oench* doctrine bars borrowers from asserting virtually any claim arising out of agreements not appearing in a contract the bank executed and maintained in its records. *See Beighley v. FDIC*, 868 F.2d 776 (5th Cir.1989). The doctrine applies whether or not the borrower intended to deceive banking authorities or acted in good faith. *See FDIC v. Investors Associates X*, 775 F.2d 152 (6th Cir. 1985). The doctrine even applies if the bank examiners had notice of the alleged agreement prior to taking control of the bank. *See Hall v. FDIC*, 920 F.2d 334 (6th Cir.1990). Finally, the doctrine applies to agreements made with bank subsidiaries, such as TMC, as well as with those made with banks themselves. *See Astrup v. Midwest Federal Savings Bank*, 886 F.2d 1057 (8th Cir.1989); *Victor Hotel v. FCA Mortgage Corp.*, 928 F.2d 1077 (11th Cir. 1991).

Plaintiff class' claims all rely on representations, omissions, agreements and/or undertakings allegedly emanating from sources outside of TMC's express contract documents, and therefore fall squarely within the *D'Oench* prohibition. There is no express, written agreement establishing TMC's involvement with a "joint venture." *See Savers Federal Savings & Loan Assn. v. Amberley Huntsville*, 934 F.2d 1201 (11th Cir.1991). Therefore, this claim must fail.

Neither is there an express, written agreement between TMC and investors (now the plaintiff class) regarding "how and when the escrow would be closed." Investors here rely on the PPM and the escrow agreement, agreements to which TMC was not a party. They also argue that TMC has within its records numerous documents (such as credit applications,

---

**5.** In addition to the *D'Oench* bar, plaintiff class' 10b–5 claim must fail because TMC's funding of investors' loans in October 1986 was not undertaken "in connection with" the sale of plaintiff class' investments, which was completed at the February 1985 escrow closing, *see Opinion and Order*, dated November 19, 1990, pp. 3 and 8; plaintiff class' common law fraud and negligent misrepresentation claims must fail because all of the investors (who are part of the plaintiff class, and to whose depositions I was cited) testified they did not base their investment decision on representations made by TMC. *See* Horvath dep., pp. 38–40; Denolf dep., pp. 70–72; Richard dep., pp. 27–29; Becherer dep., pp. 19–

**22.** Nor did TMC have any legal duty to assure the plaintiff class a completed hotel; and plaintiff class' conversion claim must fail because it is merely a warmed-over breach of contract claim.

**6.** In January, 1991, the Resolution Trust Corporation ("RTC") became the conservator of TMC's parent corporation, and by operation of law succeeded to all of the parent's right, title and interest in the investors' notes. 12 U.S.C. §§ 1821(d)(2)(A) and 1441a(b)(4). RTC was appointed receiver of TMC's parent corporation in March, 1992.

sales materials, offering documents, construction loan documents, etc.) that, "when viewed together, will satisfy the requirements ... and/or eliminate *D'Oench* 'secret' agreement considerations." *Plaintiffs' Combined Cross–Motion for Summary Judgment and Response to Defendants' Motions To Dismiss and Motions for Summary Judgment,* pp. 117–118. However, the obligations allegedly flowing from these documents are not clearly evidenced in any express, written agreement, as *D'Oench* requires, but at best can only be inferred.[7] These claims must therefore fail as well. *See Beighley,* 868 F.2d at 784; *Bell & Murphy and Assoc. v. Inter First Bank Gateway, N.A.,* 894 F.2d 750 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Fair v. NCNB Texas National Bank,* 733 F.Supp. 1099 (N.D.Tex.1990).

▇ Plaintiff class' fraud claims can be easily dispensed with as well. They all boil down to a contention that TMC falsely warranted the hotel as complete when it funded the investor loans. However, such a representation nowhere exists on any TMC contract. In *Hall, supra,* the plaintiffs had obtained a loan to finance the construction of a motel. A dispute arose, and plaintiffs sued the bank for breach of the loan agreement, alleging the bank's funding of the loan constituted a representation that the terms of the loan agreement had been satisfied. The U.S. Court of Appeals for the Sixth Circuit held that the plaintiffs were precluded from "presenting proof of any representations made by [the bank] beyond the terms of the loan agreement." *Hall,* 920 F.2d at 338. *See also Beighley, supra; Langley, supra; FDIC v. Cardinal Oil Well Servicing Co., Inc.,* 837 F.2d 1369 (5th Cir.1988); *FSLIC v. Lafayette Investment Properties, Inc.,* 855 F.2d 196 (5th Cir.1988).[8]

In an effort to salvage their tort claims against TMC, plaintiff class argued at the June 25, 1992 hearing, and in their most recent brief, that *D'Oench* is inapplicable because TMC tortiously converted, by fraud or theft, plaintiff class' mortgages and notes from escrow, and thus never acquired legal title to the instruments. Plaintiff class argued that when TMC funded the investors' mortgages in October 1986, it really was not funding those mortgages; that, instead, it was fulfilling an agreement it had to take out SSG's construction loan with a permanent loan. Plaintiff class asserted at the June 25, 1992 hearing that they had in their possession an express, written TMC document evidencing this scheme. I gave them an additional two weeks to produce this document for my inspection; but, it now appears that no such document exists. In the absence of such a document, their conversion claim still relies on alleged misrepresentations, omissions, side agreements and/or conspiratorial undertakings between TMC and other defendants that render plaintiff class' notes and mortgages something other than what they appear to be—a claim clearly barred by *D'Oench,* no matter how labeled.[9]

---

**7.** Plaintiff class also argues that such an express, written document may exist in TMC's records, but that they have been given insufficient discovery to unearth it. This claim is simply incredulous. Plaintiff class' *first* request for production of documents asked TMC to produce any agreement to provide funding to the hotel, any document regarding TMC's determinations on the completion of the hotel, and any documents relating to the funding of investors' loans which occurred in October, 1986. If such an agreement existed, plaintiff class would have already found it. Additional discovery would be futile and repetitive. *See FSLIC v. Cribbs,* 918 F.2d 557 (5th Cir.1990).

**8.** Plaintiff class' claims for secondary fraud liability against TMC must likewise fail, *see Investors X, supra; FDIC v. Dixon,* 681 F.Supp. 408 (E.D.Mich.1988); *Bohm v. Forum Resorts, Inc.,* 762 F.Supp. 705 (E.D.Mich.1991), as must plaintiff class' breach of fiduciary duty claim, *see Schlifke v. Seafirst,* 866 F.2d 935 (7th Cir.1989); *Clay v. FDIC,* 934 F.2d 69 (5th Cir.1991); *Timberland Design v. First Service Bank for Savings,* 932 F.2d 46 (1st Cir.1991).

**9.** Even if the notes and mortgages were not "assets" because of TMC's allegedly tortious conversion, *D'Oench* would still apply. *See First State Bank of Wayne County, Kentucky v. City and County Bank of Knox County, Tennessee,* 872 F.2d 707 (6th Cir.1989); *Bowen v. FDIC,* 915 F.2d 1013 (5th Cir.1990); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091 (N.D.Tex.1990); *Hall, supra,* 920 F.2d at 339 ("The doctrine may therefore be invoked even where FDIC does not have 'an interest in an asset.' ")

Accordingly, TMC's motions for summary judgment on plaintiff class' original complaint and First Amended Complaint must be granted.

### VI. *Winsor/Faricy Architects, Inc. and M.A. Mortenson Company*

■ Plaintiff class' claims against both Winsor/Faricy and Mortenson must be stayed [10] to permit arbitration pursuant to Sections 2 and 3 of the Federal Arbitration Act, 9 U.S.C. §§ 2–3. If, as plaintiff class alleges, they are direct third-party beneficiaries of both the construction contract between SSG and Mortenson, and the architect contract between SSG and Winsor/Faricy, they are bound as a matter of law by the arbitration clauses contained in those respective contracts (Article 16.1 of the construction contract and Article 9.1 of the architect contract). *See Morrie Mages and Shirlee Mages Foundation v. Thrifty Corp.,* 916 F.2d 402 (7th Cir.1990); *Interpool Limited v. Through Transport Mutual Ins. Assoc. Ltd.,* 635 F.Supp. 1503 (S.D.Fla.1985); *Laborers International Union of North America v. HSA Contractors, Inc.,* 728 F.Supp. 519 (E.D.Wis.1989). Thereafter, if necessary, this court may review and confirm, modify, correct or vacate the arbitrators' award. 9 U.S.C. §§ 9–11.

### VII. *Midwest Title Guaranty Company Motion*

Midwest Title Guaranty Company of Florida ("Midwest") has moved to drop itself as a misjoined party, while plaintiff class has moved to join Midwest as a defendant. The . circumstances surrounding these motions are as follows. When this litigation began in August, 1989, Midwest was not a named defendant. I issued the Order authorizing plaintiff class to file an amended complaint on January 7, 1991. That Order did not authorize plaintiff class to add additional party defendants, nor did plaintiff class seek leave from this court to add Midwest. Nevertheless, in plaintiff class' amended complaint, Midwest was named as a defendant.

■ Plaintiff class argues that they properly added Midwest as a defendant without an order of this court pursuant to Federal Rule of Civil Procedure ("FRCP") 15(a), which provides:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served....

However, they admit that at least one responsive pleading had been served by the time their amended complaint was filed. There is no alternative but to hold that Midwest was not properly joined pursuant to FRCP 15(a).

■ Plaintiff class next argues they are entitled to add Midwest pursuant to FRCP 21, which provides:

Parties may be dropped or added by order of the Court on motion of any party or of its own initiative at any state of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

I disagree with plaintiff class' argument. Plaintiff class added Midwest to their amended complaint in violation of FRCP 15(a); without leave of this court as required by FRCP 21; and in contravention to my January 7, 1991 Order. Furthermore, they knew as early as April, 1991 that Midwest objected to being added as a defendant, yet took no corrective action until May, 1992. At this stage of the litigation it would simply be unjust to add Midwest as a defendant. This case is nearly three years old, and the paperwork submitted thus far has surely decimated a small forest. Nothing suggests the claim against Midwest is newly discovered; indeed, an escrow closing is a normal part of any real estate transaction. Last, the claims against Midwest, if any remain viable after this Opinion, are discrete and severable. *See Michaels Building Co. v. Ameritrust Co.,* 848 F.2d 674 (6th Cir.1988).

---

**10.** To the extent plaintiff class is an intended third-party beneficiary of these contracts and to the extent any claims survive this Opinion.

Accordingly, Midwest's motion to be dropped as a misjoined party must be granted, and plaintiff class' motion to join Midwest as a defendant must be denied.

### VIII. *Damages Resulting From Breach of FFE Agreement*

As discussed above, I have already found as a matter of law that SSG breached its agreement to convey a fully furnished hotel to the plaintiff class. A hearing was held July 16, 1992, to determine the amount owed plaintiff class due to this breach.

### A. *The Measure of Damages*

#### 1. *Plaintiff Class' Position*

Plaintiff class argues first that they are entitled to rescission; next, that they are entitled to "benefit of the bargain" damages; and, last, that they are entitled to their out-of-pocket expenses.

[34] I find that rescission is totally unwarranted as a remedy. Damages amounting to approximately $6.7 million is an adequate remedy, both in fact and in law. *See Seaside Community Development Corp. v. Edwards*, 573 So.2d 142 (Fla.App. 1 Dist. 1991).

Plaintiff class next argues for "benefit of the bargain" damages, stating that that amount is "reflected by the diminution in value of the Hotel resulting from Defendants' breach...." They contend that the diminution in value of the hotel is "most appropriately measured based on Laventhol & Horwath's April 1987 Market Study of the Hotel, which shows actual cash flow for the Hotel's first four months of operation, reflects Defendants then most recently revised and reduced projections for the Hotel (dated December 4, 1986) and contains a specific line item which expressly establishes, for the first time, the actual impact that leasing of FF & E had (and would have) on cash flow." *Plaintiffs'*

*Trial Brief In Support Of Claim For Damages*, pp. 7, 9.

Even if I were to agree that members of the plaintiff class are entitled to "benefit of the bargain" damages, this approach is completely insupportable. The cash flow projections of the hotel were revised in December 1986 for a whole host of reasons unrelated to the leasing of FFE (such as increased competition, the impact of the new tax laws, and the effects of an overall economic slowdown); and, therefore, trying to figure a value based on those projections is totally inappropriate. However, plaintiff class is not entitled to "benefit of the bargain" damages, in any event. They have not shown that defendants acted in bad faith, merely that they breached their contract. *See Cook v. Deltona Corporation*, 753 F.2d 1552 (11th Cir. 1985); *Howard v. Metcalf*, 487 So.2d 43 (Fla.App. 2 Dist.1986). This now leaves out-of-pocket damages.

#### 2. *Defendants' Position*

Defendants agree that members of the plaintiff class are only entitled to their out-of-pocket lease costs, but argue they are entitled to various off-sets that reduce that amount significantly. Defendants' position, essentially, is that they are entitled to restitution for amounts they paid for additions to the hotel, additions to the pre-opening budget, etc., because they were under the mistaken belief that they could off-set those amounts by leasing, rather than purchasing, significant FFE. In other words, defendants want restitution because they spent extra sums on the hotel, believing they could recoup those amounts by breaching their contract with the plaintiff class. For obvious reasons, this claim cannot survive. *See Section 51 of the Restatement of Restitution, Comment A; Naugle v. O'Connell*, 833 F.2d 1391 (10th Cir. 1987).[11] Again, this leaves out-of-pocket damages.

---

**11.** Defendants also claim they are entitled to off-sets for leases signed after October 31, 1986, the date the Agency Agreement became effective; for leases for equipment "commonly leased" in the hotel industry; and for the tax benefits plaintiff class received as a result of the leasing. All of these arguments are unavailing. Although the timing of leases is important, it is not controlling. The mere fact that defendants leased certain FFE *after* the Agency Agreement became effective does not change the fact that the FFE was required to be purchased as part of

## B. *Out–Of–Pocket Damages*

Plaintiff class' expert, J. Stanley Blumin, testified that the total out-of-pocket expense paid, and to be paid, under the leases defendants entered into on behalf of plaintiff class (the MDFC, Mellon, Denrich, B & W, Pitney Bowes and Northern Telecom leases) is $5,161,136.09. Plaintiff class is entitled to these expenses.

■ Defendants' only serious objection was that the Northern Telecom lease should not be included because the PPM allowed defendants to lease a television and a phone for each hotel unit. However, that is exactly the rub. The PPM allowed defendants to lease *a phone,* while the Northern Telecom lease was for the guts of the hotel *phone system, i.e.,* for the computer equipment and software that made the phones in each unit work. That, clearly, was not meant to be the subject of a lease agreement, and plaintiff class is entitled to recover the costs of that lease as well.

■ Blumin also testified that plaintiff class had lost $1,290,930.47 in interest income that would have been earned had no lease payments been required and the monies been invested instead. Plaintiff class is likewise entitled to this amount.

■ In addition, Blumin testified that the plaintiff class was damaged in the amount of $281,158, due to lost investment tax credits. Unlike the earlier discussion regarding passive losses that could have been used to off-set passive gains (if any), these tax credits are a direct credit against taxes owed. I merely need to assume that each investor earned some income and paid some taxes in order to find this an appropriate component of plaintiff class' damages, and I do exactly that. Accordingly, plaintiff class is entitled to this amount as well.

■ Last, Blumin testified that the plaintiff class was damaged because they

had to borrow operating expenses to run the hotel. He stated that if the lease payments had not been made, the availability of that money would have obviated the need to borrow and saved plaintiff class $696,183 in interest. While in and of itself this may be true, plaintiff class is now trying to double-dip. That is, if the money paid on the leases had been available to them, they could have either invested it, and earned the $1,290,930.47 discussed above, or they could have used it for operating expenses, saving the $696,183 of the interest incurred; but they could not have done both. Accordingly, this portion of plaintiff class' claimed damages is disallowed.

To summarize, plaintiff class is entitled to $5,161,136.09 in damages for the actual lease payments, $1,290,930.47 in damages for lost interest income, and $281,158.00 in damages for lost investment tax credits. The total damage award is $6,733,224.56.

■ Finally, I conclude that Can–Am Corporation, Can–Am Realty Corporation, Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson are secondarily liable for SSG's breach of contract regarding the wrongful leasing of hotel furniture, fixtures, and equipment. These entities and individuals, referred to as "the Shelter Seagate Group," improperly held themselves out to investors as the developer of The Registry Hotel, capable of fulfilling SSG's contractual obligations. Because SSG was a mere instrumentality of these individuals and entities, and because these individuals and entities improperly held themselves out to investors as capable of fulfilling SSG's contractual obligations, they are liable for any damage caused by SSG's breach of contract. *See, e.g., Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla. 1984).

## IX. *Conclusion*

I reiterate that this case, with its many ramifications, presented me with numerous

the price plaintiff class paid for the hotel. Likewise, I find that defendants, despite their protestations, had no authority to enter into leases for equipment "commonly leased" in the hotel industry. Last, any tax benefits accruing to the plaintiff class as a result of this breach are

entirely speculative. Such passive losses are only allowed to be off-set against passive gains; and, because the hotel is losing money, it is unlikely any investor has been able to make use of this potential tax savings.

challenges. Now that my work is completed, I am sure that the need for conferencing and scheduling mandated by Fed. R.Civ.P. 16, and utilized here, was of utmost importance. For, when the issues were compacted into manageable questions and I addressed the various motions that the parties had filed, each came into much clearer perspective.

## X. *Orders*

For clarity's sake, the various Orders that are required to carry out the conclusions of law reached in this Opinion are serialized in this final section. Reference in a respective Order to the opinion on which it is based is contained in each individual Order. Where appropriate, the prevailing parties may submit proposed Judgments.

## ORDER

### (BREACH OF CONTRACT CLAIMS ON CLOSING OF SALE)

A trial having been held on Plaintiff Class' claim that the Shelter Seagate Group of Defendants (known as Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett G. Carlson, Graham C. Lount, Arni Thorsteinson) breached their contract with Plaintiff Class in that said Defendants closed the sale before the hotel was substantially complete, and for rescission and/or damages;

In accordance with this Court's Opinion of August 7, 1992, IT IS ORDERED that while this Court found breach, this Court also found said breach was not material and, accordingly, a Judgment of No Cause of Action may be submitted.

## ORDER

### (FURNITURE, FIXTURES, AND EQUIPMENT LEASE CLAIM)

Following a full hearing on May 7, 1991, I granted partial summary judgment in favor of the Plaintiff Class on the furniture, fixtures, and equipment ("FFE") lease claim. In accordance with that ruling made on May 7, 1991, IT IS ORDERED that summary judgment on the FFE lease claim be entered in favor of the Plaintiff Class.

A hearing having been held to determine the amount of damages caused by Defendant Shelter Seagate Group's (known as Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett G. Carlson, Graham C. Lount, Arni Thorsteinson) breach of the FFE contract and the Court having determined the amount of damages and the parties liable therefor;

IT IS ORDERED that Plaintiff Class recover damages for the FFE breach of contract claim against Defendant Shelter Seagate Corporation, primarily; and against Defendants Can–American Corporation, Can–American Realty, Garrett G. Carlson, Graham C. Lount, and Arni Thornsteinson, secondarily; in the amount of $6,733,-224.56.

## ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Merrill Lynch's Motions to Dismiss both the Initial Complaint and the First Amended Complaint are hereby GRANTED.

## ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Frank Lavin's Motions to Dismiss both the Initial Complaint and the First Amended Complaint are hereby GRANTED.

## ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Martin Cicco's Motions to Dismiss both the Initial Complaint and the First Amended Complaint are hereby GRANTED.

## ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that

Defendant Shelter Seagate Group's (known as Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett G. Carlson, Graham C. Lount, Arni Thorsteinson) Motion for Summary Judgment on all Plaintiff Class' Fraud Claims is hereby GRANTED.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Shelter Seagate Group's (known as Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett G. Carlson, Graham C. Lount, Arni Thorsteinson) Motion to Dismiss all Plaintiff Class' Interstate Land Sales Act Claims is hereby GRANTED.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Trustbank's Motion for Summary Judgment on Plaintiff Class' Original and First Amended Complaint is hereby GRANTED.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Mortenson's Motion for Stay Pending, and Directing, Arbitration is hereby GRANTED. Thereafter, if necessary, this Court may review and confirm, modify, correct or vacate the arbitrator's award. 9 U.S.C. §§ 9–11.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Winsor/Faricy's Motion for Stay Pending, and Directing, Arbitration is hereby GRANTED. Thereafter, if necessary, this Court may review and confirm, modify, correct or vacate the arbitrator's award. 9 U.S.C. §§ 9–11.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Defendant Midwest Title's Motion to be Dropped as a Misjoined Party is hereby GRANTED.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Plaintiff Class' Motion to Join Midwest Title as a Defendant is hereby DENIED.

### ORDER

In accordance with the Opinion entered on August 7, 1992, IT IS ORDERED that Plaintiff Class' Cross–Motion for Summary Judgment as to the First Amended Complaint against Defendants Merrill Lynch, Frank Lavin, Martin Cicco, and Shelter Seagate Group (known as Can–American Corporation, Can–American Realty Corporation, Shelter Seagate Corporation, Garrett Carlson, Graham Lount, Arni Thorsteinson) is hereby DENIED.

### SECTION XI.

### APPENDICES

### APPENDIX A

### DISCOVERY MOTIONS

(April 26, 1990)

[Transcript Pages 8–11]

answer to the question is, and then you can comment on whether or not what I'm saying is correct, because that's the best way for you to educate me.

MR. GERSTEIN: Okay.

THE COURT: There are, as I see it, in this complaint, three areas of alleged fraud. One is that you say that the Defendants, or some of them, did not disclose that the W.B. Johnson Company was in some way connected with the Ritz–Carlton hotel chain. You say that even though the PPM may have said that the W.B. Johnson Company was interested in putting up a hotel in the nearby area, you claim that the PPM did not say, nor did the Defendants at any time say that W.B. Johnson was in some way connected with the Ritz–Carlton. Is that one area?

MR. GERSTEIN: That's one area, but it's too narrow.

THE COURT: Well, whether or not it's too narrow is not the question.

MR. GERSTEIN: Okay. That's—

THE COURT: That's one area.

MR. GERSTEIN: That's one area.

THE COURT: All right. A second area in which you say that there was fraud is that the closing date was accelerated. The 1986 closing date was accelerated, you allege, to bring the matter within the agreements that provided that this had to be done within two years. Is that right?

MR. GERSTEIN: That's true. That's correct.

THE COURT: The third area in which you say there was fraud is that presumably it was in the PPM—I don't know if it was in some other document—that the hotel was to be furnished with approximately $13.5 million of furniture, fixtures and equipment, and that somebody decided that rather than to buy that, they were going to lease it.

MR. GERSTEIN: That's one aspect.

THE COURT: Right?

MR. GERSTEIN: That's an aspect.

THE COURT: All right. Now, those, as I see it, are the three areas in which you allege fraud, is that right?

MR. GERSTEIN: I think that's narrow, and if I could just—

THE COURT: Tell me in what areas other than those three areas you allege fraud.

MR. GERSTEIN: Okay. When you talk about the W.B. Johnson or the Ritz–Carlton, which is—

THE COURT: No, wait a minute. Not—not in the—is the issue of fraud raised in the W.B. Johnson incident?

MR. GERSTEIN: Yes, that's one narrow aspect, but it relates specifically to what we were—what I'm trying to express is that it relates specifically to competition. Based on that and the projections and the market study that's involved, and appended to the PPM, those numbers are not only unreasonable, but they don't include known facts. That is a basis of fraud, one of the acts—

THE COURT: What—what known facts?

MR. GERSTEIN: The—the Ritz–Carlton.

THE COURT: You mean the fact that the Defendants, or some of them, did not disclose that W.B. Johnson was connected with or was the Ritz–Carlton is a fraud?

MR. GERSTEIN: No. That's only one aspect of it.

THE COURT: What is the fraud?

MR. GERSTEIN: The fact that we published projections that don't include the impact of the Ritz–Carlton in the projections and in the market studies.

THE COURT: Suppose—

MR. GERSTEIN: That's fraud.

THE COURT: Suppose they had disclosed that W.B. Johnson was the Ritz–Carlton? What difference would it have made then?

MR. GERSTEIN: We would not—that is one aspect, but we would also have not known from the private placement memorandum that the projections given to us do not include the Ritz–Carlson.

THE COURT: You do admit, though, that they did disclose that W.B. Johnson was going to put up a hotel?

MR. GERSTEIN: They—they make a reference, but they also do that misleadingly. And the reason I say misleadingly—

THE COURT: All right. But, you see, you're not following me. That's an issue.

MR. GERSTEIN: Okay.

THE COURT: I'm not interested in trying the case right now.

MR. GERSTEIN: That's fine.

THE COURT: We'll call that the W.B. Johnson issue.

MR. GERSTEIN: That's fine.

THE COURT: Right? Then the closing date acceleration, you claim, is another issue.

MR. GERSTEIN: That's correct.

THE COURT: And the furniture and fixtures and equipment change from purchase to lease, you call that another incident.

MR. GERSTEIN: That's correct.

THE COURT: What other incidents are there, other than those three incidents, in which you allege fraud?

MR. GERSTEIN: In the very narrow context, your Honor, that's principally it.

THE COURT: All right.

MR. GERSTEIN: I mean there were aspects about that, but that's principally it.

THE COURT: Now, do you have any response that you

## APPENDIX B

## OPINION AND ORDER

### (Nov. 19, 1990)

This action arises out of purchases by plaintiffs of interests in a 474-room resort hotel ("Registry Hotel") to be located at Pelican Bay in Naples, Florida. Four hundred seventy-four hotel interests were sold to 298 investors, from thirty different states, for a total price of $89,225,500.

The events giving rise to this action began on or about June 15, 1982, when defendants, Can–American Corporation and/or Can–American Realty Corporation, and their principals, defendants Carlson, Lount and Thorsteinson, entered into an agreement with Westinghouse Communities of Naples, Inc. ("WCN") to purchase property for the development of the Registry Hotel. (These defendants, together with defendant, Shelter Seagate Corporation ("SSG"), are sometimes collectively referred to as "Can–Am.") At or about this time, a second developer, W.B. Johnson Company, also sought to purchase property from WCN with the intent to construct what was to become the Ritz Carlton Hotel, also to be located at Pelican Bay, Florida.

In 1983, defendant Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") agreed to act as the exclusive selling agent for the sale of Registry Hotel interests to potential investors. In the spring of 1983, Can–Am engaged defendant, M.A. Mortenson Company as general contractor, and defendant, Winsor/Faricy Architects, Inc., as architect, for Registry Hotel's development. Defendant Laventhol & Horwath ("Laventhol") was also retained in 1983 by Can–Am Realty to prepare a market study to determine the feasibility of constructing the Registry Hotel and financing its development through the sale of hotel interests.

Between February 1984 and February 1985, Can-Am and Merrill Lynch marketed interests in the Registry Hotel. As part of their marketing efforts, these defendants developed and distributed a Private Placement Memorandum ("PPM") to investors and two supplements which described the investment opportunity in detail. These materials informed investors that they could cancel their purchases for any reason until they were notified that the "Minimum Subscription Level" had been met and were notified of individual financing approval. Thereafter, investors could only cancel if the hotel was not completed within two years after investors became bound.

After the offering period ended, investors' interests were "closed into escrow" on February 15, 1985. This meant that their investment funds were delivered to an escrow agent for safekeeping until the hotel was complete. When the Registry Hotel was completed, the funds would be distributed. If the Registry Hotel was not completed within two years from the date when investors became bound, investors could cancel their purchases. Various defendants represented the Registry Hotel to be "substantially complete" as of October 30, 1986, and held a final closing on that date. At this closing, the escrow was broken, investors' funds were distributed, and investors lost all cancellation rights.

These events are the background for plaintiff investors' three claims of fraud. First, plaintiffs claim that the offering materials omitted the true identity and competitive impact of the Ritz Carlton Hotel which was subsequently built at Pelican Bay. Plaintiffs claim they were not told that this competitor hotel would be a Ritz Carlton, nor were they informed of its potential competitive impact on the Registry Hotel. Consequently, they argue, their interests are worth less than they were led to believe.

Second, plaintiffs claim that certain defendants fraudulently concealed their intention to lease additional furniture, fixtures and equipment on behalf of plaintiffs, and to thereby burden plaintiffs with cost overruns that defendants were contractually required to bear.

Third, plaintiffs claim that certain defendants fraudulently accelerated the final

closing on the sale of investors' hotel interests, so that investors would be foreclosed from exercising their cancellation rights even though the Registry Hotel was not complete within the two-year time period.

I entered an order limiting initial discovery to these three fraud claims. *See* Fed. R.Civ.Proc. 16(b). The matter is now before me on defendants' motions to dismiss for failure to state fraud with particularity, as is required by Fed.R.Civ.Proc. 9(b). Pursuant to Fed.R.Civ.Proc. 56, I have converted defendants' motions to dismiss into motions for summary judgment, and for the reasons which follow, now GRANT defendants' motions for summary judgment on plaintiffs' first claim of fraud, and deny, without prejudice, summary judgment on plaintiffs' second and third claims.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.Proc. 56. A "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 [106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265] (1986). Once the moving party has made this initial showing, summary judgment may follow if the non-moving party "fails to make a sufficient showing to establish the existence of an essential element of that party's case, on which that party will bear the burden of proof at trial." *Id.* at 323 [106 S.Ct. at 2552–53.]

In this case, defendants, as moving parties, made the initial showing required to obtain summary judgment on plaintiffs' first fraud claim. Specifically, defendants

pointed out the absence of material evidence showing that they fraudulently concealed the name "Ritz Carlton," or the potential competitive impact of that hotel on the Registry Hotel.

Plaintiffs, on the other hand, failed to make the requisite showing necessary to avoid summary judgment on their first fraud claim. To prevent summary judgment, plaintiffs, as the non-moving parties, must raise genuine issues of material fact as to all essential elements of fraud, since they bear the burden of proving these elements at trial. Elements of fraud under Securities & Exchange Commission Rule 10b–5 or common law include materiality, scienter, reliance, causation, and injury. *See, e.g., National Bank of Detroit v. Whitehead & Kales Co.*, 528 F.Supp. 940 (E.D.Mich.1981); *U.S. Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981).[1] Plaintiffs fail to raise genuine issues of material fact as to one or more of these elements in support of their first fraud claim.

First, plaintiffs raise no genuine issue of material fact regarding the alleged materiality of the name "Ritz Carlton." An omitted fact is only material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to invest. *Basic Inc. v. Levinson*, [485 U.S. 224] 108 S.Ct. 978 [99 L.Ed.2d 194] (1988). Moreover, to fulfill the materiality requirement, "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* [485 U.S. at 230–31, 108 S.Ct.] at 983.

In this case, the "total mix" of information given to investors included express written warnings that "additional units could be built on neighboring lands at Pelican Bay; that "a substantial competitive hotel chain has the right to build another hotel at Pelican Bay"; that, if built, this hotel could "dilute the occupancy, revenues

---

1. In addition to Rule 10–b5 and common law fraud, plaintiffs' securities fraud claims allege that defendants violated § 12 of the Securities Act of 1933, and § 1702(a) of the Interstate Land Sales Full Disclosure Act. Although these statutes may involve somewhat different elements of proof, they similarly require proof that defendants made misstatements or omissions of *material* fact. Because plaintiffs fail to make this showing on their first fraud claim, it is unnecessary to discuss these statutes in this opinion.

and income" of the Registry Hotel; and that it could "adversely affect the value of the [Registry] Hotel interests." PPM at 7. Because the "total mix" of information given to investors included these express warnings, a reasonable jury could not conclude that a reasonable investor would have viewed one additional piece of information—the identification of the potential competitor by the name "Ritz Carlton"—as significantly altering the total mix of investment information.

Plaintiffs also fail to raise material facts showing that investors justifiably relied on defendants' failure to identify the Ritz Carlton by name. To be actionable, an investor's reliance must be justified. *Platsis v. E.F. Hutton & Co. Inc.*, 642 F.Supp. 1277 [W.D.Mich.1986]. Reliance is not justified if an investor fails to exercise a minimal degree of care or due diligence in an attempt to discover readily available facts. *National Bank of Detroit v. Whitehead & Kales Co.*, 528 F.Supp. at 949; *McGraw v. Matthaei*, 388 F.Supp. 84 (E.D.Mich.1972). As early as May 1984, investors could have readily discovered the publicly known fact that the W.B. Johnson Hotel was a Ritz Carlton. This was known well before the offering period ended, and before investors lost cancellation rights.

Plaintiffs' claims regarding the occupancy and revenue projections also fail. First, projections of this sort are not material unless they are capable of being calculated with substantial certainty. *James v. Gerber Products Company*, 587 F.2d 324, 327 (6th Cir.1978). Plaintiffs offer no material facts showing that occupancy and revenue projections for the Registry Hotel could have been calculated with substantial certainty. In fact, it is uncontroverted that the PPM stated the contrary. It included such warnings as: "Some assumptions inevitably will not materialize. Therefore, the actual results achieved during the projection period will vary. The projected statements should not be relied upon to indicate actual results." PPM at 67. Because the offering materials contained these unambiguous warnings, investors cannot now claim that these projections were material to their investment decision.

However, even if these original projections were material and misleading, or became so once defendants knew that the Ritz Carlton was actually under construction, they were adequately revised to reflect the Ritz Carlton's competitive impact well before investors lost their general cancellation rights; and thus investors cannot now claim they reasonably relied on the original projections.

Investors were given the revised occupancy and revenue projections in a supplemental PPM issued on October 31, 1984. They could cancel their purchases for any reason until they received notice that the "Minimum Subscription Level" had been met, and received notice that they were approved for financing (*see* PPM at p. 44). These requirements were fully satisfied no earlier than February 15, 1985, at the escrow closing. Accordingly, investors had more than three months to consider whether they should cancel their purchases based on the new projections. Having failed to exercise their cancellation rights during this period, investors cannot now claim that they reasonably relied on the original projections, even assuming those projections were materially misleading.

For these reasons, defendants' motion for summary judgment is GRANTED on plaintiffs' first fraud claim, and defendant Laventhol is DISMISSED since it is not encompassed by the remaining claims. Because there may be genuine issues of material fact on plaintiffs' second and third fraud claims, defendants' motion for summary judgment on those claims is DENIED without prejudice.

Additionally, with the following exceptions, all other motions to dismiss are DENIED without prejudice. Remaining for consideration are: (1) motions to dismiss for lack of personal jurisdiction as to defendants Cicco, Lavin, Lount, and Thorsteinson; (2) motions to dismiss based on failure to satisfy the applicable statutes of limitations; (3) motions by Carlson, Shelter Seagate, and Can–Am to dismiss Counts XV and XVI of the Complaint for failure to state a cause of action for breach of contract or warranty; and (4) motion by plaintiffs for class certification.

These motions will be considered at the next hearing. Specifically, I will consider: (1) whether defendants Cicco, Lavin, Lount, or Thorsteinson had "minimum contacts" with the State of Michigan, thereby subjecting them to this court's jurisdiction; (2) whether any of plaintiffs' claims are time-barred; (3) whether plaintiffs have adequately stated a cause of action for breach

of contract or warranty; (4) whether defendants need to conduct discovery on plaintiffs' remaining fraud claims; (5) the propriety of treating plaintiffs' second fraud claim—concerning the allegedly fraudulent leasing—as a breach of contract claim; and (6) plaintiffs' motion for class certification.

The next hearing is scheduled for Friday, December 7, 1990, at 1:30 p.m., 858 Federal Building and United States Courthouse, Detroit, MI 48226.

/s/ John Feikens
John Feikens
United States District Judge
Dated: Nov. 19, 1990

## APPENDIX C

## ORDER

(March 14, 1991)

IT IS HEREBY ORDERED THAT:

1. In the above-captioned case, an expedited trial shall be held at a date to be selected by the court between April 15 and May 15, 1991.

2. Said trial shall be limited to plaintiffs' breach of contract claims against defendants Shelter Seagate Corporation, Can–American Corporation, Can–American Realty Corporation, and the individual defendants Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson.

3. Issues at said trial shall be limited to: 1) whether said defendants contractually agreed to absorb all construction cost overruns and construction risks relating to the development of the Registry Hotel, and if so, whether said defendants breached that agreement by leasing certain furniture, fixtures and equipment; and 2) whether said defendants contractually agreed to deliver to plaintiffs a "substantially complete" hotel by a certain date and, if so, whether said defendants breached that agreement.

4. Said trial shall be before a jury.

5. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), a plaintiff class shall be certified in relation to said trial. Such class shall consist of:

all persons and entities who purchased hotel interests in the Registry Hotel pursuant to the February 1, 1984 Private Placement Memorandum, and the supplements thereto, at the October 30, 1986 closing, and/or their successors and/or assigns, and who were allegedly damaged thereby (the "class"). Excluded from the class are the individual defendants, the members of their immediate families, the corporate defendants, and the subsidiaries and affiliates of the corporate and individual defendants.

6. Said class is to be given adequate notice, including but not limited to, right to opt out of said class, such notice to be mailed no later than March 22, 1991.

7. Owners of hotel interests in the Registry Hotel are not to interpret the pendency of this litigation, nor any directive of this court, as indicative of this court's permission to cease paying mortgage payments to Dominion Financial Investment Corporation and/or its successors in interest. This paragraph containing this order shall be included in the notice given to all class members as provided for in paragraph 6.

8. Only parties to the expedited trial shall participate in discovery related to that trial. With regard to said trial, plaintiffs shall be allowed to depose Kenneth W. Rogers, Sonny Dvorak, Katherine Floyd, and James E. Muller. Inasmuch as counsel for the Registry Corporation has informed the court, by way of letter dated March 13, 1991, that said corporation is agreeable to producing its employees as witnesses at the expedited trial, deposition of these employees shall not be had. Defendants participating in the expedited trial may depose Messrs. Nicodemas, Magrath, Artlett and Ehric. No other depositions are allowed.

9. The following discovery shall be had on a reciprocal basis: 1) copies of all correspondence to and from all named plaintiffs relating to the hotel and their interests in it, including correspondence from accountants and brokers; 2) identification of the Rule 26(b) discovery on all experts including their qualifications; 3) copies of all photographs in counsel's possession or which counsel intend to offer at trial relating to the hotel.

10. A final pretrial conference shall be held ten days before the date of the expedited trial, at which time the joint pretrial statement will be due.

IT IS SO ORDERED.

/s/ John Feikens
John Feikens
United States District Judge

Dated: March 14, 1991

APPENDIX D

PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

DEFENDANTS' MOTION IN LIMINE

(Filed May 8, 1991)

[Transcript Pages 5–19]

This is known as a class action.

Defendants are three corporations—Can-American Corporation, Can-American Realty Corporation, and Shelter Seagate Corporation, known in this litigation as SSG—and three individual officers of these corporations: Garrett G. Carson, Graham C. Lount, and Arnie Thorsteinson. These defendants were responsible for developing the Registry Hotel.

Now, as an initial matter, I find as a matter of law that based upon Paragraph 21(g) of the Unit Sales Agreement which all plaintiffs entered into with defendants, all of the offering materials as listed in Paragraph 17 of the Unit Sales Agreement comprise the entire contract between the plaintiffs and the defendants.

Let me repeat that. I find as a matter of law that based on Paragraph 21(g) of the Unit Sales Agreement which all plaintiffs entered into with defendants, all of the offering materials as listed in Paragraph 17 of the Unit Sales Agreement comprise the entire contract between plaintiffs and defendants.

There are two basic areas of dispute in this case. The first issue is whether defendants breached their contracts with plaintiffs by leasing instead of purchasing certain furniture, fixtures, and equipment on behalf of plaintiffs. Now, pertinent to this issue are several contract provisions.

Paragraph 1 of the Unit Sales Agreement provides that defendants agreed to sell to plaintiffs a fully furnished condominium hotel, and those words, "a fully furnished condominium hotel," are directly words from the paragraph of the Unit Sales Agreement.

Paragraph 1 of the Private Placement Memorandum known as the PPM provides that the hotel room revenues and commercial unit revenues, quote:

"will be pooled and paid to investors after deduction for hotel operating ex-penses and payment of management fees to defendants,"

unquote.

Paragraph 26 of the PPM provides that, quote:

"The Association of Unit Owners will lease on behalf of each investor a telephone and television set and that the lease payments will be common expenses,"

unquote.

Now, in connection with what I am about next to read, I call to mind the fact that yesterday I was—I received a motion for partial summary judgment filed by plaintiffs. I have had no response to that from the defendants. Is that purposeful?

MR. GASKINS: Your Honor, we—we received this also yesterday while we here in Detroit, and we have prepared no written response.

THE COURT: But you're prepared to discuss that.

MR. GASKINS: But I'm prepared to discuss it today.

THE COURT: All right, because this is what I'm headed for is to take up whether or not on this first issue as I've now defined it, summary judgment should or should not be granted.

I continue with my statement.

With the exception of telephone and television lease payments, it does not appear that SSG had a contractual right to add additional lease payments to hotel operating expenses. The Agency Agreement entered into between plaintiffs and SSG gives SSG the right to enter into leases on behalf of plaintiffs as SSG, quote, "shall in the exercise of its judgment deem prudent," unquote. This is language from the Agreement—the Agency Agreement at page F2 and F3.

However, as Paragraph 17 of the Agency Agreement clearly provides, SSG's agency authority did not commence until the hotel units were delivered to plaintiffs.

If, as it appears, it is uncontroverted that SSG entered into leases on behalf of plaintiffs prior to the delivery of the hotel units of plaintiffs, defendants may not rely on the hotel Agency Agreement to give them the right to lease furniture, fixtures, and equipment.

Thus, unless defendants can point to some other contractual provision which pro-

vided SSG with pre-closing leasing authority, summary judgment may be required on this issue, and I'll stop at this point in my statement to take up that issue first.

Mr. Gaskins, do you have any contractual provision other than what I've read which provides SSG with pre-closing leasing authority?

MR. GASKINS: Your Honor, with respect to what you have read, there are two things. The first thing is the issue relating to—

THE COURT: No, no. I asked a question.

MR. GASKINS: Okay.

THE COURT: I want your response. Did you have any contractual provision which provides SSG with pre-closing leasing authority, some other than this hotel Agency Agreement?

MR. GASKINS: No.

THE COURT: Is it uncontroverted that all of the leasing of the furniture and fixtures in controversy here took place prior to the delivery of the hotel units to plaintiffs?

MR. GASKINS: It is not uncontroverted.

THE COURT: What is your fact situation on that?

MR. GASKINS: The—the fact situation is that although the lease agreement and commitments were signed, it was not until after the closing of the sale of the hotel that the equipment was scheduled and the lease agreements were finalized so that you knew when the—or that you knew the amount of the leasing that was to take place.

The—one of the plaintiffs' exhibits that we saw last night indicated—indicates that the financing statements were filed in December of 1986. The—the commitments and the decisions respecting leasing may have been made prior to closing.

THE COURT: What authority did your clients have to do that prior to the closing?

MR. GASKINS: With respect—

THE COURT: Under what condition of the contract did they get the authority to enter into the leasing of furniture and fixtures prior to the time that the closing took place on October 31st?

MR. GASKINS: As—as a matter of contract, early on in the Private Placement Memorandum, there's a section in which it—it's described that the unit owners will rely on Shelter Seagate Corporation to—to

make the decisions to build them a first class hotel. I believe that that—fairly read, that—

THE COURT: Well, wait a minute.

MR. GASKINS: —contractual provision—

THE COURT: Wait a minute.

MR. GASKINS: —gives them—

THE COURT: Let me—let me read it with you. I asked you what the contractual provision is, so get—get it out and let's read it together.

(Pause in proceedings at 9:13; getting contract)

MR. GASKINS: Your Honor, at page 6 of the Private Placement Memorandum there's discussed—

THE COURT: Hold it. Let—let me find this page so I can follow you. Page 6—

MR. GASKINS: Of the Private Placement Memorandum, the last sentence of the paragraph entitled "New Construction, Lack of Final Plans and Specifications."

THE COURT: I—you better—you better show me what that is. Let's see.

MR. GASKINS: Actually, it's the penultimate sentence.

THE COURT: All right. I have it, and under what heading?

MR. GASKINS: "New Construction, Lack of Final Plans and Specifications."

THE COURT: All right. Go ahead. I'll read along with you. What is it—

MR. GASKINS: Okay.

THE COURT:—to which you're making reference?

MR. GASKINS: The—the penultimate sentence in that paragraph is:

"Accordingly, investors will be relying on SSG to construct and furnish a first class resort hotel."

Those words and the nature of this transaction required Shelter Seagate Corporation to act as agent for and for the benefit of the owners in that respect if issues during the course of construction came up that required action to be taken on behalf of what would be the ultimate owners. Mr. Carlson as a result of this sentence was wearing two hats throughout the construction, first as developer and second as agent, what were to be the ultimate owners despite the fact that the Agency Agreement itself was not in force until the closing of the sale.

The Agency Agreement provided under our reading the terms and conditions under which the agency relationship between Shelter Seagate Corporation and the unit owners would be effected during the course of construction.

THE COURT: And you say that that all arises from that clause: "Investors will be relying on SSG to construct and furnish a first class resort hotel"?

MR. GASKINS: Yes, your Honor, I believe so.

THE COURT: That's pretty difficult for me to read all of what you've just said into that one clause in the face of the Agency Agreement which says specifically in Paragraph 17 that SSG's agency authority did not commence until the hotel units were delivered to plaintiffs.

MR. GASKINS: Okay. If you take—if you—if you take that—that's—that is true, but strictly speaking, the—the SSG in order to discharge its obligations as the developer had to have a relationship—had to have a fiduciary or agency relationship with the owners. If the terms of the Agency Agreement itself do not—do not apply to this, then the general principles of agency would apply to the relationship during construction.

THE COURT: I'll tell you what my difficulty with that is, and that is that the plaintiffs not only bought units in this hotel but expected to make some profits on the operation of the hotel itself. I read to you Paragraph 1—the Paragraph 1 of the PPM which provided that:

"... hotel room revenues and commercial unit revenues will be pooled and paid to investors after deduction for hotel operating expenses and payment of management fees to defendants."

What I understand the plaintiffs' claimed breach is, is that by leasing the furniture and fixtures instead of paying for them, the profits that they could make were reduced because of the—the need to pay the lease rentals. They would not have had to pay the lease rentals, plaintiffs argue, if the defendants bought and paid for the furniture and fixtures rather than to provide for them through leasing and then paying the lease costs out of the profits. That's what the claimed breach is.

MR. GASKINS: Right, and that—and that is entirely true. However—

THE COURT: Well, what authority did the defendants have under the contract to do that?

MR. GASKINS: The—the actual leasing itself was undertaken after the Agency Agreement began. That is, the—there was a—

THE COURT: Well, wait a minute. The commitment—

MR. GASKINS: There was in place a—

THE COURT: Mr. Gaskins, let's not play games with each other. You told me five minutes ago that they entered into these lease arrangements prior to the closing.

MR. GASKINS: That's true. The commitments were there.

THE COURT: If you're trying to say to me now but in fact the—the leased equipment was not delivered until after the closing, that's playing with words.

When was the—when was the furniture and fixture equipment leased? It was leased, so I've always understood in that it was uncontroverted, prior to the time of the closing.

MR. GASKINS: All right.

THE COURT: Right?

MR. GASKINS: Judge, the lease agreement was signed, but there was no amount—that lease agreement could have—

THE COURT: It was—

MR. GASKINS:—after the closing been for zero.

THE COURT: Well, it could have been, but it was an enforceable agreement, wasn't it?

Look, let's not play with each other on this because I think you're grasping at straws now, Mr. Gaskins. What happened—what happened was that the agreement to lease which was decided by the defendants to be done before closing was carried out. They did in fact least. They ripened what their intention was prior to the closing into fact by accepting delivery after the closing.

MR. GASKINS: That's—that's a fact.

THE COURT: Isn't that, then, exactly contrary to the provision of the contract?

MR. GASKINS: Your Honor, I—I don't believe it is. There—if you look at the—if you look at the contract on page 9—

THE COURT: On page 9?

MR. GASKINS:—on page 9 for a minute, I want to set the context of the leasing.

THE CLERK: Which document?

THE COURT: Well, wait a minute.

MR. GASKINS: The Private Placement Memorandum. I'm sorry.

THE COURT: Oh. Page 9 of the PPM?

MR. GASKINS: Right.

THE COURT: All right.

MR. GASKINS: The leasing of the equipment was—was a—was a financing agreement. Now, if you look at "Construction of Hotel Buildings and Project Development Costs" and "Furniture, Fixtures, and Equipment," there's a Footnote 1, and it says:

"To the extent that these costs are lesser or greater than the amount estimated, SSG's profit will increase or decrease. One-half of any savings in these items will be deposited into operating shortfall escrow."

On "Pre-opening Expenses," which has a little "4" after it, there is a million-dollar line item on the estimate for the use of the sale proceeds. After closing into escrow, before closing of sale, that line item—that particular line item grew to 2.5 million dollars. That's a million and a half dollars. Somebody has to pay for it. It—it is—it—the money was spent arguably for—to the benefit of the hotel and the hotel owners. It was an unanticipated expense.

The only person that could have exercised the authority to increase that line item is the developer. That line item is not subject to the provision that to the extent the costs are lesser or greater, SSG's profit will increase or decrease. This was to have nothing to do with SSG's profit.

The developer then is in a situation in which money is needed for the hotel, and he can do—he's got two hats, and the hat of the developer says, "All right, with respect to this request"—

THE COURT: No, no. He can—he—they can have two hats, but he said, "I'm not going to use this one hat until after the hotel closing. I'm not going to have a right to use or exercise whatever power I have in this other hat until after the hotel has been delivered to the unit holders."

You see, what—what's difficult with your contention is this: the contract clearly speaks to the fact that these unit holders for a specific price arranged of between 170 to $250,000 per unit expected to get a fully furnished hotel. That's what the contract calls for. By SSG doing what you contend it had a right to do and for which I can see no basis in the contract, by leasing this furniture and equipment, what they did was clearly to eat into the hotel revenues, and maybe—and maybe it was a matter of necessity for them to lease these furniture and fixtures because they were probably running out of money, but in doing so and not having the consent of the unit holders for doing so, did they not breach the agreement? It seems to me that—that what they did clearly flies in the face of the contract provisions.

Do you have anything else you wish to say on this point, Mr. Gaskins?

MR. GASKINS: There—there is an idea hatching, Judge. Let me see if I can get a way to articulate it.

THE COURT: How long a gestation period will this—

(Pause in proceedings at 9:28 a.m.; attorney reading)

MR. GASKINS: The terms of the Lease and Security Agreement for the Mellon Financial Services lease is to begin—

THE COURT: Is this a part of the offering materials?

MR. GASKINS: No, this is not a part of the offering materials.

THE COURT: Well, then how is it a part of the contract?

MR. GASKINS: Well, it—this—this is going back to addressing briefly the issue of whether—of the commencement date of the lease—that is, whether the—whether the lease was commenced after the time of the—the Agency Agreements beginning.

The decision, as I have said—if the issue is when was the decision made to lease, the—the commencement date of the lease governs the obligations under the lease, and the—although the lease is signed by Shelter Seagate Corporation on its own behalf and as agent for the owners as lessee—

THE COURT: What date?

MR. GASKINS: Well, it's—it does say "Approved as of the 20th day of September," the commencement date of the lease.

THE COURT: Well, but that's—that's the point I'm making. That's the time that contract for leasing was entered into, that September date which was prior to the closing. How can you get away from that?

See, I don't know what issue I could give to the jury for factual determination. There doesn't seem to be any factual determination necessary.

All right. Let's—

MR. GASKINS: Okay.

THE COURT: —pass that by for the moment. Let's move on.

I'm of the opinion that summary judgment—partial summary judgment should be granted to plaintiffs on that first issue. A little later in the morning, I want to discuss potential remedies with you, and so let's—let's—let's move on, but you know which way the wind is blowing on that one.

The second major issue relates to the final closing of hotel interests. This dispute relates to whether the defendants delivered a substantially completed hotel to plaintiffs within two years from the time when plaintiffs became, quote, bound, unquote.

Paragraph 4 of the Unit Sales Agreement provides that defendants shall substantially complete construction of the hotel not more than two years after the agreement became—became binding on plaintiffs.

Now, I previously ruled that that agreement became binding on plaintiffs on February 15th, 1985. I make this finding because I find that plaintiffs waived their right to be notified of financing approval by not objecting to the lack of notice of such approval within a reasonable time period after they received notice of the escrow closing.

Accordingly, I find that the two-year completion period began to run on February 15th, 1985, and defendants then had until February 15, 1987, to substantially complete the hotel. However, because defendants elected to close on October 30, 1986, the hotel had to be substantially completed by that date.

[Transcript Page 74]

THE COURT: That's not relevant to the issue in this case.

MR. SIMON: We feel it is, your Honor, to the extent that it is admission against interest.

THE COURT: All right. Well, you have your point on the record, but I'll rule against you on that, and I will not admit this Merrill Lynch document.

All right. Anything else?

Oh, for the record, I will grant summary judgment on Issue Number 1, and you may prepare an order—partial summary judgment on Issue Number 1.

MR. GASKINS: Your—your Honor, the—earlier this morning you said, "We'll pass that for a minute."

THE COURT: I did. I passed it for two hours.

MR. GASKINS: I—I would like—I would like to say—

THE COURT: You never gave me—

MR. GASKINS: —two more things.

THE COURT: —an effective answer to my questions, Mr. Gaskin. I've heard you on it. I don't believe that it's necessary for me to hear you further, but if you've come up with a hot idea in the last two hours, what is it?

MR. GASKINS: All right. I read—I went back to read the PPM again during the five-minute break, Judge—

THE COURT: All right.

### AMENDMENT TO AUGUST 7, 1992 OPINION AND ORDER

I now state specific findings of fact pursuant to Fed.R.Civ.P. 52 and hereby incorporate them as an Amendment to my August 7, 1992 Opinion and Order:

1. Shelter Seagate Corporation, Can–American Corporation, Can–American Realty Corporation, Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson represented that the investors were dealing with a group of entities and individuals in the development of The Registry Hotel.

2. The Private Placement Memorandum at page 9 contains a section entitled "Description of Shelter Seagate Corporation, Its Affiliates and Hotel Manager". This section described the relationship of the SSG defendants as follows:

The Shelter Group of companies include Shelter Seagate Corporation's parent, Can–American Realty Corporation, and its parent, Can–American Corporation. Through various subsidiaries and related companies, the group is owned by Graham C. Lount, Garrett G. Carlson and Arni Thorsteinson. The group is engaged in the acquisition, development and syndication of residential and commercial properties in the United States and Canada, including the development (but not operation) of hotels in both countries.

3. The capitalization of Shelter Seagate Corporation was only $1,000.00 while the corporation was engaged in the construction of an $89 million hotel.

4. Thomas Hurley, Chief Financial Officer of Can–American Realty Corporation, testified at trial on May 13, 1991 that:

Can–American was the—the company that provided management of the construction process, and the employees of the Can–American or even Shelter Seagate were paid through Can–American, so Can–American was paid an overhead fee by Shelter Seagate for their services in overseeing the development of this hotel.

Trial Transcript, p. 131–IV.

5. The Merrill Lynch Marketing Guide described the developer of the hotel as follows:

Shelter Seagate Corp., ("SSG"), is a newly formed corporation, organized for the purpose of developing The Registry Hotel at Pelican Bay. SSG is a wholly owned subsidiary of Can–American Realty Corp., and through a number of holding companies, Can–American Realty Corp., is ultimately owned by Graham C. Lount, Garrett G. Carlson, and Arni Thorsteinson. The audited net worth of Can–American is $18,000,000. Fair market net worth is in excess of $50,000,000. Total assets are in excess of $350,000,-000.

Plaintiffs' Trial Exhibit 5, p. 17.

The Marketing Guide also represented that Can–American was the developer:

In addition, *Can–American is currently developing* three additional properties in Naples and Pelican Bay *besides The Registry*: . . . .

Plaintiffs' Trial Exhibit 5 (emphasis added).

6. The Marketing Guide also discusses the "Developer Expertise". The Guide states that:

The management of SSG, Gary Carlson, Graham Lount, and Arni Thorsteinson, bring to the project substantial development expertise. They have been actively engaged in the design, construction, financing, development and management of overt 18,000 units of multi-family housing in the U.S. and Canada.

Plaintiffs' Trial Exhibit 5, p. 12.

7. Further, the Marketing Guide, in the section denominated "Objections Clinic", described the developer of The Registry Hotel as follows:

Q. The start-up of a new venture is terrifying to me. Too much can go wrong. I want no part of being a trailblazer.

A. So was my first date. Seriously, nothing ventured; nothing gained. We have an *experienced Developer*, acquainted with the area, already developing property in the area; granted, not Hotel property, but still a Developer able to complete deals in Pelican Bay. And we have a proven "par excellence" Hotel Manager in The Registry Hotel Corp. Also remember, the Developer is taking all the construction risks. There are risks in this venture, but you, the Investor, are "in bed" with some very classy partners.

*Id.* at 23 (emphasis added).

8. Thus, Can–American Corporation, Can–American Realty Corporation, Garrett G. Carlson, Graham C. Lount, and Arni Thorsteinson held themselves out to investors as the developer of The Registry Hotel, capable of fulfilling Shelter Seagate Corporation's contractual obligations.

IT IS SO ORDERED.